**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. _____

Estella A. Lopez, Kevan M. Pratt, John C. Stone,
Charles Reed, Jr., Linda McDaniel, on behalf
of themselves and all others similarly situated,

     **Plaintiffs,**

vs.

JP Morgan Chase Bank, N.A.,

     **Defendant.**

)
)
)
)
)
)
)
)
)
)
)
)

09-23127

CIV-ALTONAGA

MAGISTRATE JUDGE
BROWN

FILED by _____ D.C.

OCT 19 2009

STEPHEN M. LARIMORE
CLERK U.S. DIST CT.
S.D. OF FLA. MIAMI

## CLASS ACTION COMPLAINT[1]

Plaintiffs, through undersigned counsel, on behalf of themselves and all persons similarly situated, allege the following based on personal knowledge as to allegations regarding the Plaintiffs and on information and belief as to other allegations.

## INTRODUCTION

1. This is a civil action seeking monetary damages, restitution and injunctive relief from Defendant JPMorgan Chase Bank, N.A. ("Chase" or "the Bank"), arising from its unfair and unconscionable assessment and collection of excessive overdraft fees.

2. "The Banks," as used in this Complaint, refers to both Chase and Washington Mutual, Inc., which Chase acquired on September 25, 2008. As part of the acquisition, Chase

---

[1] This is a related case to *In re: Checking Account Overdraft Litigation*, Case No. 1:09-MD-02036-JLK, which includes *McDaniel, et al. v. JPMorgan Chase Bank, N.A.*, N.D. Ga. Case No. 1:09-CV-2017-WSD. Plaintiff McDaniel will voluntarily dismiss her pending action upon the filing of this action and its transfer to the Transferee Court.

assumed the liabilities of Washington Mutual and is therefore liable for the misconduct of Washington Mutual described herein in addition to its own substantially similar misconduct.

3.       In the era of electronic banking and the ubiquitous use of debit card transactions, the assessment of overdraft fees has become a major profit center for many United States banks, including the Banks.  For years, banks covered customers who occasionally bounced checks and even did so for a time for customers using debit cards, without charging their customers.  Since the early 1990's, however, banks have devised methods to provide overdraft "protection" for customers and charge them in each instance.  A recent FDIC report estimated that overdraft fees represent 74 percent of the total service charges that are imposed on deposit accounts in the United States.  A 2008 FDIC study reports that overdraft fees for debit cards can carry an effective annualized interest rate that *exceeds 3,500 percent*.   Nonetheless, the Consumer Federation of America reports that five of the ten largest banks raised their overdraft fees in the last year.

4.       In 2007, banks collected more than $17 billion in overdraft fees.  That number nearly doubled in 2008, as more and more consumers struggled to maintain positive checking account balances.  *In 2009, banks are estimated to bring in between $27 billion to $38.5 billion in overdraft charges alone.*  As the one of the largest retail banks in the country, Chase is among the largest beneficiaries of these staggering charges.

5.       Almost by definition, these fees disproportionately affect the poor, who are most likely to maintain low balances.  Moebs Services, a research company that has conducted studies for the government as well as banks, estimates that 90 percent of overdraft fees are paid by the poorest 10 percent of banks' customer base.  Moreover, these fees have the tendency to create a domino effect, because the imposition of a service charge on an account with a negative balance

will make it less likely that the account holder's balance will reach positive territory, resulting in more fees.

6.       Before debit cards existed, banks occasionally extended the courtesy of honoring paper checks written on overdrawn or otherwise deficient accounts for customers who were typically in good standing.  Banks extended this courtesy largely because the third party involved in a sales transaction allowed the customer to pay by check, expecting the funds to be available and the check to clear.  For example, if a customer wrote a check to purchase groceries, the grocery store would only know whether the check cleared *after* the groceries had been purchased.

7.       The same considerations are not present when customers use debit cards.  Banks could simply decline to honor debit or point of sale transactions where accounts lack sufficient funds to execute the transactions.  Retail and service transactions could still be executed if consumers presented an alternative form of payment.  ATM transactions could still proceed if banks provided a warning that an overdraft fee would be incurred, and customers chose to proceed nevertheless.   In fact, until a few years ago, most banks simply declined debit transactions that would overdraw an account.

8.       Instead of simply declining debit transactions when there are insufficient funds, or warning its customers that an overdraft fee will be assessed if they proceed with the transaction, Chase routinely processes such transactions and then charges its customers an overdraft fee of $25 (for the first occurrence), $32 (for the second through fourth occurrences), or $35 (for each additional occurrence)—even when the transaction is for only a few dollars.[2]  Washington Mutual charged its customers $30 for each occurrence.  These automatic, fee-based overdraft

---

[2] For accounts in Florida, Georgia, Idaho, Oregon, and Washington State, Chase charges an overdraft fee of $34 for each occurrence.

schemes are intentionally designed to maximize overdraft fee revenue for the Banks. Additionally, as part of their inequitable motive to generate obscene profits gained through the imposition of unconscionable overdraft fees, the Banks fail to adequately disclose to its customers that they may elect to opt out of overdraft protection.

9.     In many instances, these overdraft fees cost Chase and Washington Mutual account holders hundreds of dollars in a matter of days, or even hours, when they may be overdrawn by only a few dollars. Even more egregious, customer accounts may not actually be overdrawn at the time the overdraft fees are charged, or at the time of the debit transaction.

10.    Thus, it is through manipulation and alteration of customers' transaction records that Chase maximizes overdraft penalties imposed on customers.

### JURISDICTION AND VENUE

11.    This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and at least one Plaintiff is a resident of a different state than Chase.

12.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Chase is subject to personal jurisdiction here and regularly conducts business in the Southern District of Florida, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred and continue to occur in this district.

### THE PARTIES

13.    Plaintiff Estella A. Lopez is a citizen of the State of Florida.

14.    Plaintiff Kevan M. Pratt is a citizen of the State of Indiana.

15.    Plaintiff John C. Stone is a citizen of the State of Texas.

16.    Plaintiff Charles Reed, Jr. is a citizen of the State of Louisiana.

-4-

17.     Plaintiff Linda McDaniel is a citizen of the State of Georgia.

18.     JPMorgan Chase Bank, N.A. maintains its principal place of business in Columbus, Ohio. Chase regularly and systematically conducts business throughout the State of Florida, including in this district. Among other things, Chase is engaged in the business of providing retail banking services to millions of consumers, including Plaintiffs and members of the putative Classes, which include the issuance of debit cards for use by its customers in conjunction with their checking accounts.

19.     Chase is a national bank, subject to the National Bank Act, 12 U.S.C. § 1, *et seq.*, and regulations promulgated by the Office of the Comptroller of the Currency.

## CLASS ALLEGATIONS

20.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23. This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

21.     The proposed classes are defined as:

> All Chase and/or Washington Mutual customers in the United States (except for California) who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, incurred an overdraft fee as a result of Chase's practice of re-sequencing debit card transactions from highest to lowest (the "National Class").

> All Chase and/or Washington Mutual customers having accounts at branches in the States of Connecticut, Illinois, New Jersey, New York, Ohio, Oregon, Washington, West Virginia, and Wisconsin for the purpose of asserting claims under their respective state consumer protection statutes (the "State Subclasses") (*see* Fifth Claim for Relief, *infra*).

> The National Class and the State Subclasses are collectively referred to as the "Classes."

22.     Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

23.     Excluded from the Classes are Chase, its parents, subsidiaries, affiliates, officers and directors, any entity in which Chase has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

24.     The members of the Classes are so numerous that joinder is impractical.  The Classes consist of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to Chase's records.

25.     The claims of the representative Plaintiffs are typical of the claims of the Classes in that the representative Plaintiffs, like all Class members, were charged overdraft fees by the Banks as a result of their practices of re-sequencing debit card transactions from highest to lowest.  The representative Plaintiffs, like all Class members, have been damaged by the Banks' misconduct in that they incurred and/or will continue to incur unfair and unconscionable overdraft charges.  Furthermore, the factual basis of the Banks' misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

26.     There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.

27.     Among the questions of law and fact common to the Classes are whether the Banks:

a.      Do not clearly disclose and/or refuse to allow customers to opt out of their overdraft protection programs;

b.      Do not obtain affirmative consent from customers prior to processing transactions that will result in overdraft fees;

c.      Do not alert customers that a debit card transaction will trigger an overdraft fee, and do not provide customers with an opportunity to cancel such transactions;

d.      Manipulate and reorder transactions so that they can increase the number of overdraft fees;

e.      Manipulate and reorder debits from highest to lowest in order to maximize the number of overdrafts and, consequently, the amount of overdraft fees;

f.      Impose overdrafts and overdraft fees when, but for reordering transactions, there would otherwise be sufficient funds in the account;

g.      Fail to provide customers with accurate balance information;

h.      Delay posting of transactions by customers using debit cards so that customers are charged overdraft fees on transactions, even though the customers had sufficient funds in their accounts to cover the transactions upon execution;

i.      Charge exorbitant overdraft fees that bear no relationship to the actual costs and risks of covering insufficient funds transactions;

j.      Breach their covenant of good faith and fair dealing with Plaintiffs and the other members of the Classes through their overdraft policies and practices;

k.      Convert moneys belonging to Plaintiffs and the other members of the Classes through their overdraft policies and practices;

l.      Require their customers to enter into standardized account agreements which include unconscionable provisions;

m.      Are unjustly enriched through their overdraft policies and practices;

n.      Violate the consumer protection acts of numerous states through their overdraft policies and practices; and

        o.     Chase continues to commit wrongdoing through its overdraft policies and practices.

    28.    Other questions of law and fact common to the Classes include:

        a.     The proper method or methods by which to measure damages, and

        b.     The injunctive relief to which the Classes are entitled.

    29.    Plaintiffs' claims are typical of the claims of other Class members, in that they arise out of the same wrongful overdraft policies and practices and the same or substantially similar unconscionable provisions of the Banks' account agreements and other related documents. Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other Class member.

    30.    Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Classes.

    31.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Chase, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and Chase's misconduct will proceed without remedy.

    32.    Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court.

Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## COMMON FACTUAL ALLEGATIONS

### A.     Chase and Washington Mutual

33.     Chase is one of the largest bank holding companies in the United States, with over $2.1 trillion in assets.  Chase has over 5,400 branches and 14,000 ATMs nationwide.

34.     In 2007, Washington Mutual, Inc. was the seventh largest bank in the United States, according to a 10-K Form it filed with the Securities and Exchange Commission on February 29, 2008.  At that time, Washington Mutual employed over 43,000 individuals and maintained over 2,200 branch offices in 15 states.  Washington Mutual operated 4,932 ATMs and held $188.3 billion in deposits.

35.     On September 25, 2008, Chase acquired all deposits and assets of Washington Mutual for $1.9 billion in consideration.  According to a press release issued by Chase, the acquisition created the largest depository institution in the country, with over $900 billion in customer deposits.  The acquisition also created the second-largest network of bank branches in the country and gave Chase control over 24.5 million checking accounts.

36.     Since the acquisition, Chase has owned and operated Washington Mutual's consumer banking operations, and is nearly finished converting those operations to the Chase brand.

37.     Pursuant to its acquisition agreement with Washington Mutual, Chase assumed all the liabilities of Washington Mutual, except for:  (1) preferred stock and litigation pending

against Washington Mutual related to liabilities retained by the receiver; (2) subordinated debt; (3) senior debt; (4) all employee benefit plans sponsored by Washington Mutual's holding company except for 401(k) and medical plans; (5) all management, employment, change-in-control, severance, unfunded deferred compensation, and individual consulting agreements or plans between Washington Mutual and its employees or maintained by Washington Mutual on behalf of its employees.

38.     Chase's liability for the wrongful practices described in this Complaint does not fit within any of these five categories. Therefore, Chase is liable for the harm caused by the practices, and is obligated by law to compensate Plaintiffs and Class members who were injured by Washington Mutual's overdraft fee practices.

39.     Chase is, and Washington Mutual was, in the business of providing customers with a variety of banking services. One of the services provided by the Banks for customers who open a checking account is a debit card, also known as a check card or ATM card. Through those debit cards, customers can engage in transactions using funds directly from their accounts by engaging in "debit" or "point of sale" ("POS") transactions, or may withdraw money from their accounts at automated teller machines ("ATMs"). Whether the card is used to execute POS transactions or to withdraw cash from ATM machines, the transaction is processed electronically. As a result, the Banks are notified instantaneously when the card is swiped, and have the option to accept or decline transactions at such time.

40.     The Banks employ sophisticated software to automate their overdraft systems. This program maximizes the number of overdrafts, and thus, the amount of overdraft fees charged per customer.

41.     As a result of the Banks' manipulation and alteration of customers' transactions records, funds in a customer's account are depleted more rapidly and more overdraft fees are likely to be charged for multiple smaller transactions. Indeed, overdraft charges are likely to occur at times when, but for the manipulation and alteration, there would be funds in the account and no overdraft would occur. For example, if a customer, whose account had a $50 balance at the time Chase processed several transactions, made four transactions of $10 and one subsequent transaction of $100 on the same day, Chase would reorder the debits from largest to smallest, imposing four overdraft fees on the customer. Conversely, if the $100 transaction were debited last—consistent with the actual order of transactions—only one overdraft fee would be assessed. *See* FDIC Study of Bank Overdraft Programs, November 2008, *available at*: http://www.fdic.gov/bank/analytical/overdraft/, at 11, n. 12.

**B.**     **The Banks' Relevant Customer Documents Regarding Overdrafts**

42.     Plaintiffs and all members of the Classes maintain or maintained a checking account with Chase and/or Washington Mutual.

43.     The terms of Chase's checking accounts are contained in standardized account holder agreements, presented to its customers on a "take it or leave it" basis, drafted and imposed by Chase, which was the party of vastly superior bargaining strength, and thus constitute agreements of adhesion. A representative copy of the "Account Rules and Regulations" (the "Deposit Agreement"), covering all Chase accounts, which is 31 pages long, single-spaced and in small print, is attached as Exhibit A.

44.     The Deposit Agreement states:

**Insufficient Funds**: If you don't have enough funds available in your account to cover your checks or any other withdrawals, one of these two things will happen depending on your specific account:

- We pay the check or other withdrawal and charge an Insufficient Funds fee to the account.

- We return the check or withdrawal unpaid and charge a Returned Item fee to the account. (p. 4)

45.     The Deposit Agreement also states that "[g]enerally, deposits will be credited to your account first and then we'll pay your items (e.g. checks, debit card transactions, ATM transactions and other debits to your account) from highest to lowest dollar amount each business day. Certain transactions such as wire transfers may post before others." *Id.*

46.     The Deposit Agreement further states:

Debit cards, sometimes called check cards or banking cards, are a convenient way to access your money.  These cards are accepted at millions of locations worldwide and are safer than using cash.

Your card can be used for everyday purchases including gas, groceries, dining out, shopping online and paying bills. . . .

* * *

Like writing a check, using a debit card can generate Overdraft fees.  You should have money in your account before you make a purchase and record it in your register right away regardless of when the purchase is actually subtracted from the account.

* * *

As with checks, we may authorize the transaction even if you don't have available funds in your account; however, we are not obligated to do so.

*Id*. at 5-6.

47.     In addition, the Deposit Agreement states:

We have no obligation to pay or honor any item or withdrawal request unless it is drawn or requested against available funds credited to your Account at the opening of business on the day the item is presented for payment or the request is received, even if we paid an item or honored a withdrawal request drawn or requested against insufficient funds in the past.  If we pay an item or honor your request that overdraws your Account, a deposited item has been returned unpaid, or for any other reason your Account has become overdrawn, you agree to pay the amount of the overdraft together with any fee and accrued interest identified in this Agreement immediately, whether or not you signed or requested the withdrawal or participated in the transaction creating the overdraft.

You hereby authorize us to apply any subsequent deposit to the Account against the amount of any overdraft and resulting fees or charges, including any federal or state benefit payments that you choose to deposit in any Account (including direct deposit of Social Security). . . .

Items will be posted to your Account in highest to lowest dollar amount each business day (Monday through Friday, federal holidays not included).  However, certain transactions like wire transfers may be posted before others.  We reserve the right to change this posting order without notice.  We may assess a fee for any item or withdrawal request, such as a check, in person withdrawal, ATM withdrawal, or other electronic means, when there are insufficient funds in your Account based upon the posting method identified above, whether or not the item is paid or the request honored, or whether or not an overdraft to your account has occurred.  We may assess an Extended Overdraft fee for overdraft balances that are not promptly repaid and/or charge interest for any overdraft on your Account.  You agree to pay all costs and expenses, including attorney's fees, incurred by us in the collection of any overdraft.

*Id*. at 10-11.

48.     The Deposit Agreement also states that "Insufficient Funds and Returned Item Fees will be assessed based on the number of 'Occurrences' in the previous twelve (12) months plus the current month.  An Occurrence happens any business day that at least one item is presented or withdrawal request is made against an account with insufficient funds, whether or not we honor any or all of the items or withdrawal requests.  In general, the more Occurrences

you have on the account, higher fees will be charged on each item. For example, on your second Occurrence you may pay a higher per item fee than you paid on the first Occurrence." *Id*. at 11.

49.     The Deposit Agreement does not set forth the dollar amount of fees that will be charged for purported overdrafts.

50.     Instead, a separate document, the "Account Rules and Regulations – Important Notices" ("Important Notices"), lists the dollar amount of fees that will be charged for purported overdrafts, in a chart entitled "Insufficient Funds, Returned Items, and Stop Payments." The Important Notices, a representative copy of which is attached as Exhibit B, states in small print, as follows:

Insufficient Funds and Returned Item Fees

| | |
|---|---|
| -accounts opened in FL,GA,ID,OR,WA | $ 34.00/item or withdrawal request |
| -all other accounts: | |
|     First occurrence during the current month and preceding 12 months | $ 25.00/item or withdrawal request |
|     Second through fourth occurrences during the current month and preceding 12 months | $ 32.00/item or withdrawal request |
|     Fifth and subsequent occurrences during the current month and preceding 12 months | $ 35.00/item or withdrawal request |

An "occurrence" is a day with at least one insufficient funds or returned item/withdrawal request.

* * *

Extended Overdraft Fee (If account balance remains negative for five consecutive business days):

| | |
|---|---|
| -accounts opened in CT,FL,GA,ID,NJ,NY,OR,WA | no fee |
| -accounts opened in AZ,LA,OK,TX,WV | $12.50/incident |
| -accounts opened in MI | $25.00/incident |
| -all other accounts | $15.00/incident |

51.     The Deposit Agreement and related documents, including the Important Notices, fail to disclose to customers that they have the option to "opt out" from the Bank's overdraft scheme, although it is possible for them to opt out upon request.

52.     The terms of Washington Mutual's checking accounts were contained in standardized account holder agreements, presented to its customers on a "take it or leave it" basis, drafted and imposed by Washington Mutual, which was the party of vastly superior bargaining strength, and thus constitute agreements of adhesion.    Washington Mutual's contractual provisions and fee schedule concerning overdraft fee practices, in fact, are substantially similar to the corresponding documents that Chase imposes on consumers.   A representative copy of the "Account Disclosures and Regulations" covering Washington Mutual "deposit accounts," which is 92 pages long, single-spaced and in small print, is attached as Exhibit C.

53.     Exhibit C states:

> **Non-Sufficient Funds/Uncollected Funds/Overdrafts**
> If a check you write or any other transfer or withdrawal request is presented for payment, or if we otherwise receive notice of such check, transfer, or withdrawal request, and sufficient funds are not available in your account (due to non-sufficient funds, uncollected items, or otherwise), the Bank shall have the authority to process same in any order, at its option, and if such is not otherwise required to be paid in accordance with an overdraft line of credit or overdraft transfer service agreement with us, Bank may, in its sole discretion, either (1) make payment in accordance with such check, transfer or withdrawal request or (2) return the check, transfer or other withdrawal unpaid, and, in either case, we will not be liable to you for doing so. . . .
>
> [I]f the Bank chooses to pay the check, transfer or withdrawal and the Bank is not reimbursed by an automatic advance from your line of credit or transfer authorization, we will impose an Overdraft Charge for each item, transfer or withdrawal in the amount disclosed in the *Statement of Fees* applicable to your account.   You agree that you will, WITHOUT DEMAND OR NOTICE FROM US, immediately deposit or otherwise pay Bank sufficient good funds to eliminate any overdraft and to pay the

Overdraft Charge. . . . If the Bank chooses not to pay the check, transfer or withdrawal, the Bank will assess a Non-Sufficient Funds Charge for each item or transaction in the amount disclosed in the *Statement of Fees* applicable to your account. We may also close your account without notice, unless notice is required by law. Should we allow an overdraft, we will not be obligated to continue the practice at a later time, nor will we be obligated to notify you of such discontinuance. You are responsible for immediately reimbursing the Bank for all overdrafts and returned items, regardless of when or why returned, and for all Overdraft Charges and Non-Sufficient Funds Charges. . . .

The Bank may, at its option, pay checks, transfers and withdrawals, including, without limit, electronic transactions such as ATM, debit card, electronic check, automated and electronic bill payments and other automated transactions presented for payment against your account, despite insufficiency of good funds in the account, up to the amount of the Overdraft Limit it has established, but has no obligation to do so. Fees will be assessed as set forth above for overdrafts created in any manner including, without limit, by transaction types described above (pp. 30-31).

54.     Exhibit C also states that "[t]he Bank determines the order of posting deposits, checks, debits and other charges to your account unless otherwise required by law. Deposits/credits, checks, debits and other charges arriving to your account on the same day may be credited/paid/returned in any order at the Bank's option. We may give preference to any checks, debits or charges payable to the Bank or any affiliate of the Bank." *Id.* at 32.

55.     Exhibit C further states:

> **Balance Calculation/Definitions**
> We calculate the balance in your account differently for different purposes.
>
> *Available Balance.* Your Available Balance is the balance at any time that is available for withdrawal in accordance with our Funds Availability Policy. . . .
>
> *Collected Balance.* Your Collected Balance is the balance in your account including deposits which we are deemed to have collected in accordance with the Balance Calculation/Determining Collected Balance section below. . . .
>
> *Ledger Balance (sometimes referred to as "Current Balance").* Your Ledger Balance is the balance at the time of the inquiry, which includes all

> deposits we deem received. . . .

*Id.* at 46.

56.     In addition, Exhibit C states that "[t]he Bank reserves the right to change its fees from time to time without notice, except as may be required by law," and that "[t]he Bank may elect to waive any of these Rules, but any such waiver will only apply on that occasion." *Id.* at 55-56, 70.

57.     Exhibit C does not set forth the dollar amount of fees that will be charged for purported overdrafts.

58.     Instead, a separate document, the "Statement of Fees," a representative copy of which is attached as Exhibit D, lists the dollar amount of fees that will be charged for purported overdrafts, in a chart entitled "Account & Other Service Fees."  In small print, the chart states:

> Overdraft Charge (if paid) and Non-Sufficient
> Funds Charge (if returned)……………………..     $30.00/item
> Maximum of  $150.00   per day

59.     Neither Exhibit A nor Exhibit C (together, the "Deposit Agreements), nor any related documents, including the Important Notices or Statement of Fees, disclose to customers that they have the option to "opt out" from the Banks' overdraft schemes, although it is possible for them to opt out upon request.

### C.     Chase's Re-Ordering of Checking Account Transactions

60.     In an effort to maximize overdraft revenue, Chase manipulates and reorders debits from highest to lowest during given periods of time.  Chase reorders transactions for no reason other than to increase the number of exorbitant overdraft fees it can charge.  This practice violates numerous consumer protection laws and the covenant of good faith and fair dealing in the Bank's Deposit Agreement.

61.    In addition, Chase misleads its customers regarding its reordering practices.  The statements in the Deposit Agreement are deceptive and unconscionable.  While Chase encourages its customers to use debit cards—informing consumers that the cards are a "convenient way to access your money," "are accepted at millions of locations worldwide," "are safer than using cash," and "can be used for everyday purchases including gas, groceries, dining out, shopping online and paying bills"—Chase fails to disclose its wrongful practices relating to its imposition of overdraft fees from debit card purchases.  Chase states that "*[g]enerally*, deposits will be credited to your account first and then we'll pay your items (e.g. checks, debit card transactions, ATM transactions and other debits to your account) from highest to lowest dollar amount *each business day*."  However, Chase fails to disclose that it maximizes its overdraft fees, at consumer expense, by grouping together POS transactions that occurred on *subsequent* days with POS transactions that occurred on *earlier* days, and reordering them so that higher debits that occurred on subsequent days are posted to its customers' accounts before lower debits that occurred on earlier days, contrary to the terms of the Bank's Deposit Agreement and its customers' reasonable expectations.  Despite these predatory practices, Chase markets itself as a company that will always "do the right thing by our customers."  Chase's practices violate the covenant of good faith and fair dealing implied in the Deposit Agreement as well as the consumer protection laws of numerous States.

62.    Washington Mutual's checking account agreement similarly violates these and other laws by failing to inform consumers that Washington Mutual's standard practice was to reorder account transactions from highest to lowest to maximize the number of individual $30 overdraft fees, to consumer detriment.  In addition, Washington Mutual's checking account agreement contains numerous deceptive and unconscionable provisions.

63.     Chase touts the purported benefits of its debit cards in advertisements aimed at luring new customers and retaining current ones.  Chase advertises the purported benefits of its checking accounts and debit cards on its Chase and Washington Mutual websites:

a.      "Use your card to pay for your purchases—groceries, gas, bills or even a cup of coffee.  The money will be deducted directly from your checking account."

b.      "Purchases are automatically subtracted from your checking account and recorded on your monthly statement."

c.      "If asked 'debit or credit,' always select 'credit' and sign for the purchase. The money for your purchases is always deducted from your checking account when you use your debit card, even if you select 'credit.'  When paying bills (e.g., utilities, cable television, telephone) with your debit card, always select 'credit card' if prompted or ask the biller to process your debit card as a credit transaction; do not provide your PIN.  The money for your bill payment will still be deducted from your checking account."

d.      "With your Online, On Time Guarantee, you never need to worry about your late payments."

e.      "You can schedule exactly when you need your payments sent.  You can choose whether to make a one-time or a repeating payment."

f.      "Our free online bill pay service with a WaMu checking account lets you control who, when and how much to pay.  There are no stamps to buy, envelopes to lick or multiple sites to log in to  Just schedule the payment and it's done.  And online bill pay transactions are guaranteed to arrive on the scheduled date."

64.     Each of these advertisements is misleading and deceptive because each creates the expectation that account funds are debited immediately at the time of a purchase, in the amount

of that purchase only. Furthermore, each advertisement is likely to lead customers to believe that transactions will be processed in the order in which they are incurred, as opposed to being reordered and processed ahead of, or behind, transactions from different days. As described herein, Chase fails to meet these expectations: funds are not depleted immediately at the time of purchase in the amount of that purchase only, and Chase reorders transactions from different days for its own benefit, to consumer detriment.

65.     Transactions involving debit cards used by Chase's customers, including the withdrawal of cash from ATM machines and POS transactions with vendors, are processed electronically. As a result, Chase is notified instantaneously when the customer's debit card is swiped, and has the option to accept or decline these transactions.

66.     Notwithstanding the instantaneous nature of these electronic debit card transactions, under Chase's posting system, it fails to post charges in the order in which they are incurred or received. Chase developed a policy and employs a practice whereby account charges and debits are posted to its customers' accounts out of chronological order for the sole purpose of maximizing the number of overdraft transactions and, therefore, the amount of overdraft fees charged to its customers.

67.     Instead of processing such transactions in chronological order, Chase processes them starting with the largest debit and ending with the smallest debit, so as to generate the largest possible number of overdrafts and the greatest possible amount of overdraft fees.

68.     Chase refrains from immediately posting charges to a customer's account as it receives them—sometimes for multiple business days. By holding charges rather than posting them immediately to an account, Chase is able to amass a number of charges on the account. Subsequently, Chase posts all of the amassed charges on a single date. When the group of

charges is eventually posted to the customer's account, Chase posts them in order of largest to smallest—not in the order in which they were received or in the order in which they were charged. This delayed posting results in the imposition of multiple overdraft fees that would not otherwise be imposed. The delayed posting also prevents customers from ascertaining the accurate balances in their accounts.

69.    Chase's policy and practice of posting charges from largest to smallest, rather than chronologically, is specifically designed to maximize the generation of overdraft fees by triggering overdraft fees for account charges that would not otherwise result in such fees.

70.    Chase enforces an unconscionable policy whereby charges incurred are posted to customers' accounts in a non-chronological order, from highest to lowest, and are held for multiple days and then batched together, to maximize the number of overdraft transactions and fees. Chase's processing practices substantially increase the likelihood that customers' smaller charges will result in multiple overdraft fees. The practices provide Chase with substantially higher service fee revenues than it would otherwise achieve absent these practices.

71.    Before it was acquired by Chase, Washington Mutual engaged in substantially similar practices concerning the reordering of checking account transactions and the imposition of overdraft fees on consumers.

72.    As a result, Plaintiffs and members of the Classes have been assessed overdraft fees for transactions which occurred when they actually had sufficient funds in their accounts to cover those transactions.

**D.    Chase's Cloaking of Accurate Balance Information**

73.    Chase actively promotes the convenience of its debit cards and other electronic debiting, but fails to provide customers with accurate balance information. When customers

execute account transactions, they generally do not have access to an accurate balance register or balance information.

74.     Chase provides inaccurate balance information to its customers through its electronic network.  In certain cases, Chase informs its customers that they have a positive balance when, in reality, they have a negative balance, despite Chase's actual knowledge of outstanding debits and transactions.

75.     Even when Chase has actual knowledge of outstanding transactions which have already created a negative balance in a customers' account, it encourages the customer to incur more overdraft charges by approving—rather than prudently declining—subsequent debit card purchases and other electronic transactions.

76.     Chase also assesses overdraft fees at times when actual funds in the customer account are sufficient to cover all debits that have been submitted to the Bank for payment.  It does this by placing a "hold" on actual funds in the customer's account.  In doing so, Chase charges overdraft fees where it faces no risk, because the cash balance in the customer's account has not dropped below zero.

77.     Washington Mutual engaged in substantially similar practices that resulted in the cloaking of accurate balance information.

### E.     Chase's Failure to Notify Customers of Overdrafts or Advise Customers of Their Right to Opt Out

78.     At the time its debit cards are used in POS transactions or at ATMs, Chase is able to determine, almost instantaneously, whether there are sufficient funds in a customer's account to cover that particular transaction.  Chase has the technological capability to decline transactions (which it does when a pending transaction would exceed a pre-determined, overdraft tolerance limit for the account), or notify customers at that very moment that the particular debit card

transaction would result in an overdraft.  Chase could give customers the option to decline the transaction to avoid incurring the overdraft fee, but it does not do so because it seeks to maximize the amount of revenue generated through its assessment of overdraft fees.

79.     Notwithstanding its technological capabilities and actual knowledge, Chase fails to provide notice to Plaintiffs and the Classes that a particular debit card transaction will result in an overdraft and, hence, an overdraft fee.  Because Chase's customers are not notified of the potential overdraft, and are not given the option of declining the debit card transaction or providing another form of payment, the customers incur monetary damages in the form of overdraft fees.

80.     Chase fails to make Plaintiffs and Class members aware that they can opt out of its overdraft scheme upon request, thereby avoiding any overdraft fees from being incurred.

81.     Washington Mutual similarly failed to notify customers of overdrafts or advise customers of their right to opt out.

F.     **The Banks' Overdraft Policies and Practices Are Contrary to Best Practices**

82.     By engaging in the conduct described herein, the Banks failed to follow the list of "best practices" for overdraft programs set forth in the "Joint Guidance on Overdraft Protection Programs" ("Joint Guidance") issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration (collectively, the "Agencies").  A copy of the Joint Guidance is attached as Exhibit E.  These "best practice" recommendations include: "Provide election or opt-out of service. Obtain affirmative consent of consumers to receive overdraft protection.  Alternatively, where overdraft protection is automatically provided, permit consumers to 'opt-out' of the

overdraft program and provide a clear consumer disclosure of this option." 70 F.R. 9127-01, 9132.

83.    According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . . This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee." 73 F.R. 28904-01, 28929 (May 19, 2008).

84.    The Joint Guidance also advises banks to "[a]lert customers before a transaction triggers any fees. When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees." 70 F.R. 9127, 9132. The Joint Guidance further advises that "[t]his notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice." *Id*.

85.    Similarly, the list of "best practices" recommended in "Overdraft Protection: A Guide for Bankers," issued by the American Bankers Association, includes offering customers the option of "opting out" of any overdraft programs, and informing customers, before they access funds, that a particular point of sale or ATM transaction will cause them to incur an overdraft fee. A copy of "Overdraft Protection: A Guide for Bankers" is attached as Exhibit F.

86.    The Banks' overdraft policies make it difficult for customers to avoid injury even if they carefully track the balance in their account. In fact, the Agencies have stated that "Injury" resulting from such policies "is not reasonably avoidable" by the consumer. 73 F.R. 28904-01, 28929. "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out. Although

consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account. For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available."

87.     On October 6, 2009, the Center for Responsible Lending issued a report entitled "Overdraft Explosion:  Bank Fees for Overdrafts Increase 35% in Two Years." The report, attached as Exhibit G, finds that it is now "standard procedure to automatically enroll checking account customers in their most expensive overdraft loan program." The report finds that debit card transactions account for more overdraft fees than traditional checks or any other type of transaction, even though "debit card transactions and ATM withdrawals . . . could easily be denied for no fee." The report also finds that overdraft fees increased 35 percent from 2006 to 2008, and that over 50 million Americans overdrew their accounts in a 12 month period, with 27 million accounts incurring five or more overdraft fees.

88.    A chart from the research company Moebs Services shows that, in every year since 1992, banks have gained increased revenues from overdraft fees:



**Bank and Credit Union Revenue from Overdraft Programs and Insufficient-Funds Fees, In $Billions**

### G.    The Banks' Unconscionable Provisions and Policies

89.    The Banks' overdraft policies and practices are unconscionable in the following respects, among others:

        a.    The Banks do not disclose or reasonably disclose to customers that they have the option to "opt out" of the Banks' overdraft scheme;

        b.     The Banks do not obtain affirmative consent from checking account customers prior to processing a transaction that will overdraw the account and result in an overdraft fee;

        c.     The Banks do not alert customers that a debit card transaction will trigger an overdraft, and do not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

        d.     The Deposit Agreements and related documents are contracts of adhesion in that they are standardized forms, imposed and drafted by the Banks, parties of vastly superior bargaining strength, and only relegate to the customer the opportunity to adhere to them or reject the agreements in their entirety;

        e.     The amount of overdraft fees is disclosed in an ineffective, ambiguous, misleading, and unfair manner, since it is not contained in the Deposit Agreements, but rather in different and separate documents, the Important Notices and the Statement of Fees, which are not signed by the depositor; and

        f.     The Deposit Agreements provided to customers are ineffective, ambiguous, deceptive, unfair, and misleading.

    90.    Chase's Deposit Agreement also contains an arbitration clause and a class action waiver which states:

> PLEASE READ THIS PROVISION CAREFULLY. IT PROVIDES, WITH THE SPECIFIC EXCEPTION STATED BELOW, THAT ANY DISPUTE MUST BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT. YOU WILL NOT BE ABLE TO BRING A CLASS ACTION OR OTHER REPRESENTATIVE ACTION IN COURT, NOR WILL YOU BE ABLE TO BRING ANY CLAIM IN ARBITRATION AS A CLASS ACTION OR OTHER REPRESENTATIVE ACTION. YOU WILL NOT BE ABLE TO BE PART OF ANY CLASS ACTION OR OTHER

REPRESENTATIVE ACTION BROUGHT BY ANYONE ELSE, OR TO BE REPRESENTED IN A CLASS ACTION OR OTHER REPRESENTATIVE ACTION.  IN THE ABSENCE OF THIS ARBITRATION AGREEMENT, YOU AND THE BANK MIGHT OTHERWISE HAVE HAD A RIGHT OR OPPORTUNITY TO BRING CLAIMS IN A COURT, BEFORE A JUDGE OR JURY, AND/OR TO PARTICIPATE OR BE REPRESENTED IN A CASE FILED IN COURT BY OTHERS (INCLUDING CLASS ACTIONS).  EXCEPT AS OTHERWISE PROVIDED BELOW, THOSE RIGHTS ARE WAIVED. OTHER RIGHTS THAT YOU WOULD HAVE IF YOU WENT TO COURT, SUCH AS THE RIGHT TO APPEAL AND TO CERTAIN TYPES OF DISCOVERY, MAY BE MORE LIMITED OR MAY ALSO BE WAIVED.

Either you or the Bank may, without the other's consent, elect mandatory, binding arbitration of any claim, dispute or controversy raised by either you or the Bank against the other, or against the employees, parents, subsidiaries, affiliates, beneficiaries, heirs, agents or assigns of the other, arising from or relating in any way to this Agreement, any prior account agreement between you and the Bank, or the advertising, the application for, or the approval of your Account (the "Claim" or "Claims").  All Claims originating from or relating to this Agreement are subject to arbitration, no matter what theory they are based on or what remedy they seek, whether legal or equitable.  This includes Claims based on contract, tort (including intentional tort), fraud, agency, negligence, statutory or regulatory provisions, or any other sources of law, or any request for equitable relief.

Claims subject to arbitration include Claims that are made as counterclaims, cross claims, third party claims, interpleaders or otherwise, and any party to a proceeding in court may elect arbitration with respect to any Claims advanced in the lawsuit by any party or parties.

As an exception to this arbitration provision, you retain the right to pursue in a small claims court, any Claim that is within that court's jurisdiction and proceed on an individual basis.

If you or the Bank elects to arbitrate a Claim, the arbitration will be conducted as an individual action.  Neither you nor the Bank consents or agrees to any arbitration on a class or representative basis, and the arbitrator shall have no authority to proceed with any arbitration on a class or representative basis.  This arbitration provision applies to and includes any Claims made and remedies sought as part of any class action, private attorney general or other

representative action, which Claims hereby are made subject to arbitration on an individual (non-class, non-representative) basis. This means that even if a class action lawsuit or other representative action, such as that in the form of a private attorney general action, is filed, any Claim between you and the Bank related to this Agreement raised in such lawsuits will be subject to an individual arbitration Claim if either you or the Bank so elects.

Deposit Agreement, p. 19.

91.     The above cited provisions are unconscionable because the Deposit Agreement and related documents, to the extent they are deemed contracts, are unenforceable contracts of adhesion and the arbitration provision itself is substantively unconscionable.

### H.     Recently Announced Changes in Chase's Overdraft Policies and Practices Do Not Offer Any Remedial Benefits to Customers

92.     On September 22, 2009, Chase announced plans to overhaul its overdraft policies on a going-forward basis. The changes do nothing to remedy the past wrongs to Plaintiffs and the Classes. They do not retroactively reverse the charges wrongly debited from their accounts, nor do they prevent Chase from continuing its unfair and unconscionable methods of business.

### I.     The Banks' Overdraft Practices Harmed Plaintiffs

93.     Plaintiff Estela A. Lopez is a current checking account customer of Chase and a former checking account customer of Washington Mutual.

94.     In connection with her account, Chase and/or Washington Mutual issued a debit card or cards to Ms. Lopez. A debit card allows customers to access their checking account funds by using the card to execute a transaction. The charge is processed electronically, and the Bank has the option to accept or decline the transaction at the point of sale.

95.     Chase and Washington Mutual each charged Ms. Lopez multiple overdraft fees. For example, based on information and belief, Ms. Lopez was charged six overdraft fees on August 25, 2009, in the amount of $34.00 each, for a total of $204.00.  Based on information and belief, the overdraft fees were based on the following ordering of transactions:

### Balance Sheet per J.P. Morgan Chase Reordering Scheme
### (Debits Processed from Highest to Lowest)

| Date Posted | Debit Description | Debits | Fees | Balance |
|---|---|---|---|---|
| | **Beginning Balance on 8/24/09:** | | | **$275.91** |
| 8/24/09 | BJ's Wholesale | 164.54 | | 111.37 |
| 8/24/09 | Publix | 82.63 | | 28.74 |
| 8/24/09 | Exxon Mobil | 49.00 | | -20.26 |
| 8/24/09 | Publix | 30.77 | | -51.03 |
| 8/24/09 | Quick Nails | 24.00 | | -75.03 |
| 8/24/09 | Steve's Pizza | 19.89 | | -94.92 |
| 8/24/09 | Party City | 12.69 | | -107.61 |
| 8/24/09 | Las Vegas Restaurant | 7.37 | | -114.98 |
| 8/25/09 | Overdraft Items Fee | | 204.00 | |
| | **Total Fees:** | | **$204.00** | |

96.     If Chase had not manipulated and reordered Ms. Lopez's transactions from highest to lowest, she would not have incurred six overdraft fees.

97.

98.     For instance, if Chase had posted the transactions from lowest to highest, Ms.

Lopez would have incurred only one overdraft fee instead of six:

### Balance Sheet if Debits Were Processed from Lowest to Highest

| Date Posted | Debit Description | Debits | Fees | Balance |
|---|---|---|---|---|
| | **Beginning Balance on 9/10/09:** | | | **$275.91** |
| 8/24/09 | Las Vegas Restaurant | 7.37 | | 268.54 |
| 8/24/09 | Party City | 12.69 | | 255.85 |
| 8/24/09 | Steve's Pizza | 19.89 | | 235.96 |
| 8/24/09 | Quick Nails | 24.00 | | 211.96 |
| 8/24/09 | Publix | 30.77 | | 181.19 |
| 8/24/09 | Exxon Mobil | 49.00 | | 132.19 |
| 8/24/09 | Publix | 82.63 | | 49.56 |
| 8/24/09 | BJ's Wholesale | 164.54 | | -114.98 |
| 8/25/09 | Overdraft Item Fee | | 34.00 | |
| | | **Total Fees:** | **$34.00** | |

- 31 -

99.     Likewise, if Chase had posted the transactions in chronological order, Ms. Lopez would have incurred only two overdraft fees instead of six:

### Balance Sheet if Debits Were Processed in Chronological Order[3]

| Date of Transaction | Debit Description | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 08/24/09: | | | $275.91 |
| 8/19/09 | Party City | 12.69 | | 263.22 |
| 8/20/09 | Exxon Mobil | 49.00 | | 214.22 |
| 8/20/09 | Steve's Pizza | 19.89 | | 194.33 |
| 8/21/09 | Publix | 82.63 | | 111.70 |
| 8/21/09 | Quick Nails | 24.00 | | 87.70 |
| 8/21/09 | Las Vegas Restaurant | 7.37 | | 80.33 |
| 8/22/09 | BJ's Wholesale | 164.54 | | -84.21 |
| 8/22/09 | Publix | 30.77 | | -114.98 |
| 8/25/09 | Overdraft Items Fee | | 68.00 | |
| | | **Total Fees:** | **$68.00** | |

100.    Plaintiff Kevan M. Pratt is a current checking account customer of Chase.

101.    In connection with his account, the Bank issued a debit card to Mr. Pratt.

---

[3] For each chart that lists the transactions in chronological order, the transactions are shown as listed in the Banks' statements, re-sorted only by date. Because the statements do not indicate the hour and minute of each transaction, Plaintiffs have listed the transactions for each particular day in the same order in which they are listed in the statements, sorting only from earlier dates to later dates. Thus, if the Banks' statements list transactions that occurred on one particular day in some order other than chronological—sorting from highest to lowest transaction, for example—Plaintiffs have not changed that order. As a result, the chronological charts in this Complaint may reflect even more overdraft fees than Plaintiffs would have incurred had the Banks posted the transactions in strict chronological order.

102.    Chase charged Mr. Pratt multiple overdraft fees.  For example, based on information and belief, Mr. Pratt was charged seven overdraft fees on February 6, 2008, in the amount of $30.00 each, for a total of $210.00.  Based on information and belief, the overdraft fees were based on the following ordering of transactions:

**Balance Sheet per J.P. Morgan Chase Reordering Scheme**
**(Debits Processed from Highest to Lowest)**

| Date Posted | Debit Description | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 2/5/08: | | | $ 122.57 |
| 2/5/08 | Check 1334 | 338.83 | | -216.26 |
| 2/5/08 | ATM/Debit Card: Mike's Express Car Wash | 15.00 | | -231.26 |
| 2/5/08 | ATM/Debit Card: Mcl Carmel | 13.25 | | -244.51 |
| 2/5/08 | ATM/Debit Card: Taco Bell | 10.36 | | -254.87 |
| 2/5/08 | Electronic Withdrawal: HSBC Card | 50.00 | | -304.87 |
| 2/5/08 | Electronic Withdrawal: Wamu Pvn | 45.00 | | -349.87 |
| 2/5/08 | Electronic Withdrawal: Ebay | 4.08 | | -353.95 |
| 2/6/08 | Insufficient Funds Fee | | 210.00 | |
| | | **Total Fees:** | **$210.00** | |

103.    If Chase had not manipulated and reordered Mr. Pratt's transactions from highest to lowest, he would not have incurred seven overdraft fees.

104.  For instance, if Chase had posted the transactions from lowest to highest, Mr. Pratt would have incurred only two overdraft fee instead of seven:

### Balance Sheet if Debits Were Processed from Lowest to Highest

| Date Posted | Debit Description | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 2/5/08: | | | $122.57 |
| 2/5/08 | Electronic Withdrawal: Ebay | 4.08 | | 118.49 |
| 2/5/08 | ATM/Debit Card: Taco Bell | 10.36 | | 108.13 |
| 2/5/08 | ATM/Debit Card: Mcl Carmel | 13.25 | | 94.88 |
| 2/5/08 | ATM/Debit Card: Mike's Express Car Wash | 15.00 | | 79.88 |
| 2/5/08 | Electronic Withdrawal: Wamu Pvn | 45.00 | | 34.88 |
| 2/5/08 | Electronic Withdrawal: HSBC Card | 50.00 | | -15.12 |
| 2/5/08 | Check 1334 | 338.83 | | -353.95 |
| 2/6/08 | Insufficient Funds Fee | | 60.00 | |
| | | **Total Fees:** | **$ 60.00** | |

105.  Likewise, if Chase had posted the transactions in chronological order, Mr. Pratt would have incurred only three overdraft fees instead of seven:

### Balance Sheet if Debits Were Processed in Chronological Order

| Date of Transaction | Debit Description | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 2/5/08: | | | $122.57 |
| 2/3/08 | ATM/Debit Card: Mike's Express Car Wash | 15.00 | | 107.57 |
| 2/3/08 | ATM/Debit Card: Taco Bell | 10.36 | | 97.21 |
| 2/4/08 | ATM/Debit Card: Mcl Carmel | 13.25 | | 83.96 |
| 2/5/08 | Electronic Withdrawal: HSBC Card | 50.00 | | 33.96 |
| 2/5/08 | Electronic Withdrawal: Wamu Pvn | 45.00 | | -11.04 |
| 2/5/08 | Electronic Withdrawal: Ebay | 4.08 | | -15.12 |
| 2/5/08 | Check 1334 | 338.83 | | -353.95 |
| 2/6/08 | Insufficient Funds Fee | | 90.00 | |
| | | **Total Fees:** | **$ 90.00** | |

106.  Plaintiff John C. Stone is a current checking account customer of Chase.

107.   In connection with his account, the Bank issued a debit card to Mr. Stone.

108.   Chase charged Mr. Stone multiple overdraft fees.   For example, based on information and belief, Mr. Stone was charged three overdraft fees on July 7, 2009, in the amount of $32.00 each, for a total of $96.00.  Based on information and belief, the overdraft fees were based on the following ordering of transactions:

**Balance Sheet per J.P. Morgan Chase Reordering Scheme**
**(Debits Processed from Highest to Lowest)**

| Date Posted | Debit Description | Debits | Fees | Balance |
|---|---|---|---|---|
| | **Beginning Balance on 7/6/09:** | | | **$ 598.33** |
| 7/6/09 | Check #176 | 450.00 | | 148.33 |
| 7/6/09 | ATM Withdrawal | 100.00 | | 48.33 |
| 7/6/09 | Card Purchase- Kroger | 94.31 | | -45.98 |
| 7/6/09 | Card Purchase – Famex Pharmacy | 90.00 | | -135.98 |
| 7/6/09 | Card Purchase – Tobacco Mart | 25.45 | | -161.43 |
| 7/7/09 | Insufficient Funds Fee | | 96.00 | |
| | | | **Total Fees:** | **$96.00** |

109.   If Chase had not manipulated and reordered Mr. Stone's transactions from highest to lowest, he would not have incurred three overdraft fees.

110.   For instance, if Chase had posted the transactions from lowest to highest, Mr. Stone would have incurred only one overdraft fee instead of three:

**Balance Sheet if Debits Were Processed from Lowest to Highest**

| Date Posted | Debit Description | Debits | Fees | Balance |
|---|---|---|---|---|
| | **Beginning Balance on 7/6/09:** | | | **$598.33** |
| 7/6/09 | Card Purchase – Tobacco Mart | 25.45 | | 572.88 |
| 7/6/09 | Card Purchase – Famex Pharmacy | 90.00 | | 482.88 |
| 7/6/09 | Card Purchase- Kroger | 94.31 | | 388.57 |
| 7/6/09 | ATM Withdrawal | 100.00 | | 288.57 |
| 7/6/09 | Check #176 | 450.00 | | -161.43 |
| 7/7/09 | Insufficient Funds Fee | | 32.00 | |
| | | | **Total Fees:** | **$ 32.00** |

111.    Likewise, if Chase had posted the transactions in chronological order, Mr. Stone would have incurred only one overdraft fee instead of three:

### Balance Sheet if Debits Were Processed in Chronological Order

| | | **Debits** | **Fees** | **Balance** |
|---|---|---|---|---|
| | **Beginning Balance on 7/6/09:** | | | **$598.33** |
| **Date of Transaction** | **Debit Description** | | | |
| 7/3/09 | Card Purchase- Kroger | 94.31 | | 504.02 |
| 7/3/09 | Card Purchase – Famex Pharmacy | 90.00 | | 414.02 |
| 7/4/09 | Card Purchase – Tobacco Mart | 25.45 | | 388.57 |
| 7/6/09 | ATM Withdrawal | 100.00 | | 288.57 |
| 7/6/09 | Check #176 | 450.00 | | -161.43 |
| 7/7/09 | Insufficient Funds Fee | | 32.00 | |
| | | **Total Fees:** | **$ 32.00** | |

112.    Plaintiff Charles Reed, Jr. is a current or former checking account customer of Chase and/or Washington Mutual.

113.    In connection with his account, the Bank issued a debit card to Mr. Reed.

114.    Chase charged Mr. Reed multiple overdraft fees.  For example, based on information and belief, Mr. Reed was charged three overdraft fees on September 3, 2009, in the amount of $35.00 each, for a total of $105.00.  Based on information and belief, the overdraft fees were based on the following ordering of transactions:

### Balance Sheet per JP Morgan Chase Reordering Scheme (Debits Processed from Highest to Lowest)

| | | **Debits** | **Fees** | **Balance** |
|---|---|---|---|---|
| | **Beginning Balance on 9/01/09:** | | | **$ 81.77** |
| **Date Posted** | **Debit Description** | | | |
| 9/02/09 | Check No. 208 | 50.00 | | 31.77 |
| 9/02/09 | ATM Withdrawal 09/01 | 40.00 | | - 8.23 |
| 9/02/09 | Card Purchase 09/01 Walgreen | 9.05 | | - 17.28 |
| 9/02/09 | Card Purchase 09/01 Walgreen | 5.23 | | - 22.51 |
| 9/03/09 | Insufficient Funds Fee | | -105.00 | |
| | | **Total Fees:** | **$105.00** | |

115.    If Chase had not manipulated and reordered Mr. Reed's transactions from highest to lowest, he would not have incurred three overdraft fees.

116.    For instance, if Chase had posted the transactions from lowest to highest, Mr. Reed would have incurred only one overdraft fee instead of three:

### Balance Sheet if Debits Were Processed from Lowest to Highest

| Date Posted | Debit Description | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 09/01/09: | | | $ 81.77 |
| 9/02/09 | Card Purchase 09/01 Walgreen | 5.23 | | 76.54 |
| 9/02/09 | Card Purchase 09/01 Walgreen | 9.05 | | 67.49 |
| 9/02/09 | ATM Withdrawal 09/01 | 40.00 | | 27.49 |
| 9/02/09 | Check No. 208 | 50.00 | | - 22.51 |
| 9/03/09 | Insufficient Funds Fee | | -35.00 | |
| | | Total Fees: | $ 35.00 | |

117.    Likewise, if Chase had posted the transactions in chronological order, Mr. Reed would have incurred only one overdraft fee instead of three:

### Balance Sheet if Debits Were Processed in Chronological Order

| Date of Transaction | Debit Description | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 7/15/09: | | | $ 81.77 |
| 9/01/09 | ATM Withdrawal 09/01 | 40.00 | | 41.77 |
| 9/01/09 | Card Purchase 09/01 Walgreen | 9.05 | | 32.72 |
| 9/01/09 | Card Purchase 09/01 Walgreen | 5.23 | | 27.49 |
| 9/01/09 | Check No. 208 | 50.00 | | - 22.51 |
| 9/03/09 | Insufficient Funds Fee | | -35.00 | |
| | | Total Fees: | $ 35.00 | |

118.    Plaintiff Linda McDaniel is a current checking account customer of Chase and a former checking account customer of Washington Mutual.

119. In connection with her account, Chase and/or Washington Mutual issued a debit card or cards to Ms. McDaniel.

120. Chase and Washington Mutual each charged Ms. McDaniel multiple overdraft fees. For example, based on information and belief, Ms. McDaniel was charged three overdraft fees on December 11, 2008, in the amount of $34.00 each, for a total of $102.00. Based on information and belief, the overdraft fees were based on the following ordering of transactions:

### Balance Sheet per J.P. Morgan Chase Reordering Scheme
### (Debits Processed from Highest to Lowest)

| Date Posted | Debit Description | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 12/10/08: | | | $ 151.78 |
| 12/10/08 | MC-WM Supercenter McDonough | 118.47 | | 33.31 |
| 12/10/08 | GPC EBill | 107.70 | | -74.39 |
| 12/10/08 | Check #4050 | 50.00 | | -124.39 |
| 12/10/08 | Check #4051 | 45.00 | | -169.39 |
| 12/11/08 | Overdraft Charge | | 102.00 | -271.39 |
| | | Total Fees: | $102.00 | |

121. If Chase had not manipulated and reordered Ms. McDaniel's transactions from highest to lowest, she would not have incurred three overdraft fees.

122. For instance, if Chase had posted the transactions from lowest to highest, Ms. McDaniel would have incurred only two overdraft fees instead of three:

### Balance Sheet if Debits Were Processed from Lowest to Highest

| Date Posted | Debit Description | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 12/10/08: | | | $151.78 |
| 12/10/08 | Check #4051 | 45.00 | | 106.78 |
| 12/10/08 | Check #4050 | 50.00 | | 56.78 |
| 12/10/08 | GPC EBill | 107.70 | | -50.92 |
| 12/10/08 | MC-WM Supercenter McDonough | 118.47 | | -169.39 |
| 12/11/08 | Overdraft Charge | | 68.00 | -237.39 |
| | | Total Fees: | $ 68.00 | |

123.   Likewise, if Chase had posted the transactions in chronological order, Ms. McDaniel would have incurred three overdraft fees:

**Balance Sheet if Debits Were Processed in Chronological Order**

| Date of Transaction | Debit Description | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 12/10/08: | | | $151.78 |
| 12/10/08 | MC-WM Supercenter McDonough | 118.47 | | 33.31 |
| 12/10/08 | GPC EBill | 107.70 | | -74.39 |
| 12/10/08 | Check #4050 | 50.00 | | -124.39 |
| 12/10/08 | Check #4051 | 45.00 | | -169.39 |
| 12/11/08 | Overdraft Charge | | 102.00 | -271.39 |
| | | **Total Fees:** | **$ 102.00** | |

124.   The Banks failed to notify any of these Plaintiffs that they could incur overdraft fees on transactions even though there were sufficient funds in the checking account to cover the transaction at the time the transaction was executed.  In addition, the Banks never notified these Plaintiffs, at the time they executed the purported insufficient funds transactions described above, that their checking account were overdrawn or that they would be charged an overdraft fee as a result of the transactions.  Furthermore, the Banks paid, rather than returned, all of the debit card charges described above, even though Plaintiffs' accounts purportedly lacked sufficient funds to cover the transactions.

125.   Based on information and belief, the overdraft charges incurred by Plaintiffs are representative of hundreds of millions of dollars of overdraft fees that the Banks wrongfully assessed and deducted from its customers' accounts.  These wrongful takings are especially egregious considering the fact that the Banks approved each transaction and knew at the time of approval whether there were sufficient funds in the account to cover the transaction.

**J.**    **The Damages Sustained by Plaintiffs and the Classes**

126.    As shown by these examples, Chase and Washington Mutual's overdraft policies make it difficult for a customer to avoid injury even if the customer keeps close track of the balance in his or her account. In fact, the Agencies have stated that "injury" resulting from such policies "is not reasonably avoidable" by consumers. 73 F.R. 28904-01, 28929. "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out. Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account. For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available." *Id.*

127.    According to rules proposed by the Agencies, "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . . This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee." 73 F.R. 28904-01, 28929 (May 19, 2008).

128.    Thus, as a consequence of the Banks' overdraft policies and practices, Plaintiffs and the Classes have been wrongfully forced to pay overdraft fees. The Banks have improperly deprived Plaintiffs and the Classes of significant funds, causing ascertainable monetary losses and damages.

129.    As a consequence of the Banks' improper overdraft fees, the Banks have wrongfully deprived Plaintiffs and the Classes of funds to which it had no legitimate claim.

130.    Plaintiffs and members of the Classes had sufficient funds in their accounts to cover at least some of the transactions for which they were charged overdraft fees. Plaintiffs and

members of the Classes either had adequate funds to cover the transactions posted to their accounts, or the accounts were allowed to become overdrawn, even by *de minimis* margins, exclusively so that the Banks could impose these wrongful charges. In many instances, the Banks' manipulation of the process for imposing overdraft fees triggered a cascade of charges that exponentially added to the charges it collected from Plaintiffs and Class members.

131.    All conditions precedent to the relief sought herein have either occurred or have been performed or waived.

132.    Chase is liable for Washington Mutual's misconduct relating to the imposition of overdraft fees because, pursuant to contract, Chase assumed the liabilities of Washington Mutual upon acquiring it. Accordingly, *hereinafter* the Complaint uses the term "Chase" to mean *both* Chase and Washington Mutual.

## FIRST CLAIM FOR RELIEF

### Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing[4]
### (On Behalf of the National Class)

133.    Plaintiffs repeat paragraphs 1 through 131 above.

134.    Plaintiffs and Chase have contracted for bank account deposit, checking, ATM and debit card services, as embodied in Chase's Deposit Agreement and related documentation.

135.    Good faith is an element of every contract pertaining to the assessment of overdraft fees. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means

---

[4] Florida, New York and certain other states recognize a claim for breach of the covenant of good faith and fair dealing as a separate and independent claim from breach of contract. Other states treat breach of the covenant of good faith and fair dealing as a species of breach of contract. For the sake of convenience in this multi-district litigation, the Complaint pleads these two types of claims, which are substantively identical, in a single count.

preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

136.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

137.    Since at least 2003, Chase has breached the covenant of good faith and fair dealing in the Deposit Agreement through its overdraft policies and practices as alleged herein.

138.    Plaintiffs and members of the National Class have performed all, or substantially all, of the obligations imposed on them under the Deposit Agreement.

139.    Plaintiffs and members of the National Class have sustained damages as a result of Chase's breach of the covenant of good faith and fair dealing.

**SECOND CLAIM FOR RELIEF**

**Unconscionability**
**(On Behalf of the National Class)**

140.    Plaintiffs repeat paragraphs 1 through 131 above.

141.    Chase's overdraft policies and practices are substantively and procedurally unconscionable in the following respects, among others:

a.    The Bank does not disclose or reasonably disclose to customers that they have the option to "opt out" of the Bank's overdraft scheme;

     b.     The Bank does not obtain affirmative consent from checking account customers prior to processing a transaction that will overdraw the account and result in an overdraft fee;

     c.     The Bank does not alert its customers that a debit card transaction will trigger an overdraft, and does not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

     d.     The Deposit Agreement and related documents, including the Important Notices, are contracts of adhesion in that they are standardized forms, imposed and drafted by the Bank, which is a party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety;

     e.     The amount of overdraft fees is disclosed in an ineffective, ambiguous, misleading, and unfair manner, since it is not contained in the Deposit Agreement, but rather in a separate document, the Important Notices, which is not signed by the depositor; and

     f.     The Deposit Agreement provided to customers is ineffective, ambiguous, deceptive, unfair, and misleading.

142.     Considering the great business acumen and experience of Chase in relation to Plaintiffs and the National Class, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

143.     The imposition of overdraft charges which exceed the amount overdrawn (*e.g.*, the imposition of a $32 charge on an overdraft of less than $32) is itself unconscionable. Such

charges are not reasonably related to the Bank's cost of covering the overdraft and/or its risk of nonpayment (where the Bank pays the overdraft), or to the Bank's cost of returning the item unpaid (where the Bank does not pay the overdraft).

144.    Plaintiffs and members of the National Class have sustained damages as a result of Chase's unconscionable policies and practices as alleged herein.

## THIRD CLAIM FOR RELIEF

### Conversion
### (On Behalf of the National Class)

145.    Plaintiffs repeat paragraphs 1 through 131 above.

146.    Chase had and continues to have a duty to maintain and preserve its customers' checking accounts and to prevent their diminishment through its own wrongful acts.

147.    Chase has wrongfully collected overdraft fees from Plaintiffs and the members of the National Class, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

148.    Chase has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiffs and the members of the National Class, without legal justification.

149.    Chase continues to retain these funds unlawfully without the consent of Plaintiffs or members of the National Class.

150.    Chase intends to permanently deprive Plaintiffs and the members of the National Class of these funds.

151.    These funds are properly owned by Plaintiffs and the members of the National Class, not Chase, which now claims that it is entitled to their ownership, contrary to the rights of Plaintiffs and the members of the National Class.

152.    Plaintiffs and the members of the National Class are entitled to the immediate possession of these funds.

153.    Chase has wrongfully converted these specific and readily identifiable funds in violation of law.

154.    Chase's wrongful conduct is continuing.

155.    As a direct and proximate result of this wrongful conversion, Plaintiffs and the members of the National Class have suffered and continue to suffer damages.

156.    By reason of the foregoing, Plaintiffs and the members of the National Class are entitled to recover from Chase all damages and costs permitted by law, including all amounts that Chase has wrongfully converted.

### FOURTH CLAIM FOR RELIEF

#### Unjust Enrichment
#### (On Behalf of the National Class)

157.    Plaintiffs repeat paragraphs 1 through 131 above.

158.    Plaintiffs, on behalf of themselves and the National Class, assert a common law claim for unjust enrichment.

159.    By means of Chase's wrongful conduct alleged herein, Chase knowingly provides banking services to Plaintiffs and members of the National Class that are unfair, unconscionable, and oppressive.

160.    Chase knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the National Class.  In so doing, Chase acted with conscious disregard for the rights of Plaintiffs and members of the National Class.

161.    As a result of Chase's wrongful conduct as alleged herein, Chase has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the National Class.

162.    Chase's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

163.    Under the common law doctrine of unjust enrichment, it is inequitable for Chase to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of overdraft fees on Plaintiffs and members of the National Class in an unfair, unconscionable, and oppressive manner.  Chase's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

164.    The financial benefits derived by Chase rightfully belong to Plaintiffs and members of the National Class.  Chase should be compelled to disgorge in a common fund for the benefit of Plaintiffs and members of the National Class all wrongful or inequitable proceeds received by them.  A constructive trust should be imposed upon all wrongful or inequitable sums received by Chase traceable to Plaintiffs and the members of the National Class.

165.    Plaintiffs and members of the National Class have no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF

### Violations of State Unfair Trade Practice Laws
### (On Behalf of the State Subclasses)

166.    Plaintiffs repeat paragraphs 1 through 131 above.  This claim is asserted on behalf of the members of each State Subclass under their respective consumer protection statutes.

167.   Chase engages in unfair business practices relating to the imposition of overdraft fees on consumers, in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, *et seq.*

168.   Chase engages in unfair business practices relating to the imposition of overdraft fees on consumers, in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq.*

169.   Chase engages in unconscionable business practices relating to the imposition of overdraft fees on consumers, in violation of N.J. Stat. §§ 56:8-1, *et seq.*

170.   Chase engages in deceptive and misleading business practices relating to the imposition of overdraft fees on consumers, in violation of New York General Business Law § 349.

171.   Chase engages in unfair business practices relating to the imposition of overdraft fees on consumers, despite prior notice that its  conduct is unconscionable, in violation of the Ohio Consumer Sales Practices Act, Ohio Code §§ 1345.01, *et seq.*

172.   Chase engages in unfair and unconscionable business practices relating to the imposition of overdraft fees on consumers, in violation of the Oregon Unlawful Trade Practices Law, Or. Rev. Stat. §§ 646.605, *et seq.*

173.   Chase engages in unfair business practices relating to the imposition of overdraft fees on consumers, in violation of the Washington Consumer Protection Act, Wash. Rev. Code §§ 19.86.010, *et seq.*

174.   Chase engages in unfair business practices relating to the imposition of overdraft fees on consumers, in violation of W. Va. Code §§ 46A-6-101, *et seq.*

175.    Chase engages in unfair business practices relating to the imposition of overdraft fees on consumers, in violation of Wis. Stat. §§ 100.20, *et seq.*

176.    As redress for Chase's repeated and ongoing violations of these consumer protection statutes, Plaintiffs and the Classes are entitled to, *inter alia*, damages, declaratory relief, and injunctive relief requiring Chase to immediately cease the practices alleged in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes they seeks to represent, demand a jury trial on all claims so triable, and demand judgment as follows:

1.    Injunctive relief enjoining Chase from charging overdraft fees under its current policies and from engaging in the wrongful, unfair, and unconscionable practices alleged herein.

2.    Restitution of all overdraft fees paid to Chase by Plaintiffs and the Classes, as a result of the wrongs alleged herein, within the applicable statutes of limitations, in an amount to be determined at trial;

3.    Disgorgement of the ill-gotten gains derived by Chase from its misconduct;

4.    Actual damages in an amount according to proof;

5.    Punitive and exemplary damages;

6.    Pre-judgment interest at the maximum rate permitted by applicable law;

7.    Costs and disbursements incurred by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

8.    Such other relief as this Court deems just and proper.

Dated:     October 16, 2009

_____
Bruce S. Rogow, Esquire
Florida Bar No. 067999
bruce@abbrclaw.com
Robert C. Gilbert, Esquire
Florida Bar No. 561861
bobby@abbrclaw.com
ALTERS BOLDT BROWN
  RASH & CULMO, P.A.
4141 N.E. 2nd Avenue
Miami, Florida 33137
Tel:  (305) 571-8550
Fax:  (305) 571-8558

*Lead Counsel for Plaintiffs*

Ruben Honik, Esquire
Pennsylvania Bar No. 33109
rhonik@golombhonik.com
GOLUMB & HONIK, P.C.
1515 Market Street
Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
Fax: 215-985-4169

Barry R. Himmelstein, Esquire
California Bar No. 157736
bhimmelstein@lchb.com
Michael W. Sobol, Esquire
California Bar No. 194857
msobol@lchb.com
Jordan Elias, Esquire
California Bar No. 228731
jelias@lchb.com
Mikaela Bernstein, Esquire
California Bar No. 261301
mbernstein@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Tel: 415-956-1000
Fax: 415-956-1008

Robert C. Josefsberg, Esquire
Florida Bar No. 40856
rjosefsberg@podhurst.com
Victor M. Diaz, Jr., Esquire
Florida Bar No. 503800
vdiaz@podhurst.com
John Gravante, III, Esquire
Florida Bar No. 617113
jgravante@podhurst.com
PODHURST ORSECK, P. A.
City National Bank Building
25 W Flagler Street
Suite 800
Miami, FL 33130-1780
Tel: 305-358-2800
Fax: 305-358-2382

/s/ Edward Adam Webb
Edward Adam Webb, Esquire
Georgia Bar No. 743910
adam@webllc.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
flemond@webllc.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange SE, Suite 480
Atlanta, GA 30339
Tel: 770-444-9325
Fax: 770-444-0271

Ted E. Trief, Esquire
New York Bar No. 1476662
ttrief@triefandolk.com
Barbara E. Olk, Esquire
New York Bar No. 1459643
bolk@triefandolk.com
TRIEF & OLK
150 E 58th street
34th Floor
New york, NY 10155
Tel: 212-486-6060
Fax: 212-317-2946

*Plaintiffs' Executive Committee*

ATTACHMENT / EXHIBIT _A_

# EXHIBIT A



## ACCOUNT RULES
## AND REGULATIONS

**YOUR GUIDE TO:**

CHECKING

SAVINGS

CERTIFICATES OF DEPOSIT

OVERDRAFT PROTECTION

PRIVACY POLICY

# Welcome to Chase

Thank you for opening your new account. We want to make it easy for you to bank with us, whenever and wherever you choose. Our 3,000-plus Chase branches in 17 states and over 14,000 Chase and WaMu ATMs nationwide, combined with online banking, bill payment, Chase Mobile[SM] and account alerts on Chase.com, help make sure you're never far from your money.

# About this guide

This guide contains the following three sections. Please review this information and keep it with your records.

**1. Helpful Information for Managing Your Account**

In this section you'll find information about our banking options, as well as steps you can take to help prevent fees and get the most out of your account.

**2. Deposit Account Agreement**

The second section is your Deposit Account Agreement, or contract, with us.

The Deposit Account Agreement also includes the following disclosures (which are separate documents we provided to you) that apply to our personal and business accounts:

- Rates for interest bearing accounts
- Personal accounts:
  Additional Banking Services and Fees
  Funds Availability Policy for Personal Accounts
  Personal account products
- Business accounts:
  Additional Banking Services and Fees
  Business account products
  Business Deposit Express Fees and Agreement
  Funds Availability Policy for Business Accounts
- Any additional disclosures such as amendments or agreements that we will provide to you, either when you open your account or if we change the terms and conditions of your account

**3. Chase Privacy Policy**

The Chase Privacy Policy explains what we do to keep information about you private and secure.

# Table of Contents

**Section I:**   **Helpful Information for Managing Your Account**

Important Customer Responsibilities ................................................... 2
   • Manage Your Account
   • Update Your Personal Information
   • Review Your Statement
   • Safeguard Your Information

Your Banking Options ................................................................ 3
   • Branches
   • ATMs
   • Chase Online℠
   • Chase by Phone
   • Chase Mobile℠
   • Chase by Mail

Deposits ........................................................................... 3
   • Direct Deposits
   • Funds Availability

Withdrawals from Your Checking or Savings Account ................................... 4
   • Writing a Check
   • Posting Order
   • Insufficient Funds
   • Overdraft Protection
   • Stop Payments
   • Withdrawal Limitations on Your Savings Account

Debit Cards ........................................................................ 5

Important Information About ATM Safety............................................. 6

Certificates of Deposit and Retirement Certificates of Deposit ......................... 7
   • Automatically Renewable CD
   • Single Maturity CD
   • Term
   • Maturity Date
   • Grace Period
   • Interest Rate
   • CD Special Interest Rate

Personal Information at Account Opening ............................................ 7

Inactive and Unclaimed Accounts ................................................... 7

Spanish Language Preference ....................................................... 7

**Section II:**   **Deposit Account Agreement**

General Account Terms and Conditions .............................................. 8

Check 21 – Substitute Checks and Your Rights ....................................... 20

Endorsement Standards............................................................ 21

Electronic Funds Transfer Services ................................................. 22

Alerts and Chase Mobile℠ Services ................................................. 26

Overdraft Protection Services ...................................................... 27

**Section III: Chase Privacy Policy** ............................................... 28

**Index** ........................................................................... 31

# SECTION I:

## Helpful Information for Managing Your Account

### Important Customer Responsibilities

1. **Manage Your Account:** We think it's better to help you avoid fees than watch you make costly mistakes. So follow these rules every day, and you'll manage your checking account smoothly for years to come.

   - **Make sure deposits are available before you spend** – When money goes into your checking account as a direct deposit, the whole amount is available to spend that day. But deposits you make with a paper check can take several days to become available. So review your available balance to be sure the money is available for use before you spend it.

   - **Record every transaction on the spot** – Don't assume you'll remember to do it when you get home. That's how innocent mistakes happen. If anyone on your account writes a check, uses an ATM or makes any transaction at all, record it right away.

   - **In doubt? Get your available balance in seconds** – Enroll in Chase Mobile[SM] at Chase.com/Mobile and then text BAL to CHASE (24273) at any time. You can also get your balance at any Chase ATM, on Chase.com or by telephone at one of the numbers on the back cover of this booklet. Any time you review your available balance, the amount may not include recent checks you've written or purchases you've made, because they can take time to reach us. So record every transaction in your register.

   - **Leave yourself a cushion and never spend below it** – Pick a specific amount (such as $50 or $100) and treat it as your personal "no spend" zone. That way, a small mistake won't leave you overdrawn.

   - **Realize you just spent more than you have? Don't let the account stay overdrawn** – Make a deposit as soon as possible to cover the overdraft and any fees.

2. **Update Your Personal Information:** Please make sure we have your most current information because it will affect how we reach you, where we mail your statements and how we provide tax reporting to the Internal Revenue Service.

   - Always alert us when you change or add personal information, such as your name, address, e-mail address, phone number, Social Security number or resident/citizenship status.

   - If you have a change or addition, call us, stop by any of our branches, visit Chase.com or write to us. You'll find a list of our telephone numbers and our address on the back cover of this booklet.

   - **Note:** We may change your address if the U.S. Postal Service tells us that you have a new address. If this happens, we'll send you a letter about the change.

3. **Review Your Statement:** It's important to always take a few minutes to review each statement for accuracy:

   - It's your responsibility to promptly notify us of any unauthorized transactions or other discrepancies, generally within 30 days of the statement date. However, some notification timeframes for personal accounts like the ones below could be longer:

     - **Electronic transactions, such as debit card purchases:** See the "In Case of Errors or Questions About Your Electronic Funds Transfers" section for details.

     - **Substitute Checks:** See the "Check 21 – Substitute Checks and Your Rights" section for details.

   - Call us as soon as possible to report concerns. If you don't contact us within the timeframes outlined in the Deposit Account Agreement, we may not be able to help you clear up the issue:

     - Calling us is the fastest way to let us know there's a problem. Please note that if you call us, we may ask you to follow up in writing.

     - Your statement has information about how to report unauthorized transactions, other discrepancies and errors. For more details, see your Deposit Account Agreement.

   - Your statement also includes other important information for your review:

     - Changes to your Deposit Account Agreement
     - Helpful service messages
     - Debit card rewards information
     - Contact information

     **Note:** You may be paying account fees that you can avoid. Please stop by any of our branches and we'll help you figure out if there's a way we can reduce or eliminate certain fees.

4. **Safeguard Your Information:** We have state-of-the-art tools in place to keep your information secure. We also need you to do your part by always protecting your:

   - account statements
   - IDs and passwords

2

- debit cards and PINs
- checks (blank or paid)
- signature stamps
- any other bank-related documents – paper or electronic – that may have information about you or your account

Keep your confidential information private to help avoid fraud or identity theft. If you don't take reasonable precautions to protect your personal information, we may not accept liability if your information becomes compromised.

And, don't forget to frequently update your computer's security software to help protect it from online criminals and viruses.

## Your Banking Options

We offer many ways for you to bank when and where it's most convenient for you, including:

- **Branches:** We have more than 3,000 branches in 17 states. Visit Chase.com or call us to find a branch near you.
- **ATMs:** There are more than 9,000 Chase ATMs in branches and many other convenient locations where you can make deposits, withdrawals or transfers. If you need help finding an ATM, visit Chase.com or call us. If you use other banks' ATMs, you may pay fees from them, as well as from us. The best way to avoid fees? Always use a Chase ATM.
- **Chase Online**SM**:** When you register on Chase Online, you can check balances, pay bills, transfer money, sign up for account alerts and more – any time and anywhere you have Internet access. Visit Chase.com for details and a demo.
- **Chase by Phone:** Our automated service is available 24/7 so you can check balances, transfer money and more. We also offer banker assistance by telephone during extended business hours. If you prefer to speak with a banker, just call Chase by Phone and enter your debit card number and PIN. See the back cover of this booklet for our phone numbers.
- **Chase Mobile**SM**:** Text your account and it texts you back. After you sign up on Chase.com, you'll have 24/7 access anywhere your cell phone has service to view balances and transaction history.
- **Chase by Mail:** You can mail deposits to:
  Chase by Mail
  P.O. Box 36520
  Louisville, KY  40233-6520

## Deposits

1. **Direct Deposits:** Your employer or a government agency can deposit funds electronically into your account so you'll have access to your money the same day we receive it. Here are more details:
   - Direct deposit signup forms are available at any of our branches or on Chase.com.
   - If you want to confirm a direct deposit, go to Chase.com or call us. Or, you can set up voice or e-mail alerts on Chase.com and we'll notify you when we receive your deposit.

2. **Funds Availability:** There are differences between when you make a deposit, when we consider your deposit received and when the funds become available for your use. It's important to understand these differences because if you try to use funds that aren't available, it may result in returned checks and fees.

   We've summarized a few key points about our Funds Availability Policy below. We know this is a complicated topic, so please don't hesitate to ask us if you have any questions. In addition, **please read the entire Funds Availability Policy that you received at account opening.**

   - **When Your Deposit Is Received:** We consider your deposit received on the day you make your deposit if it's made on a business day before the cutoff time displayed at the branch or ATM. If you make your deposit on a weekend or a legal holiday or after the cutoff time on a business day, we'll consider the deposit received on the following business day.

     **For example:** You make your deposit on Friday at 6:10 p.m. and the cutoff is at 6 p.m. We consider the deposit received on the next business day, which is Monday. However, if Monday is a holiday, we consider the deposit received on Tuesday.

   - **When Your Deposit Is Available:** Generally, we give you next day availability on your deposit, except when you deposit a check that isn't drawn on a Chase account. Refer to your Funds Availability Policy about non-Chase checks. In addition, this means:
     - We'll use the funds from your deposit to pay items (including checks, online payments and debit card purchases) on the day we receive your deposit.
     - Your funds aren't available for cash withdrawals until the next business day.
     - Cash deposits made with a banker, wire transfers and electronic direct deposit of your paycheck or government benefit payment

3

are available for a cash withdrawal on the same day we receive them.

- **Holds:** If we hold your funds beyond the time-frame in your Funds Availability Policy, it will be noted on your receipt after you make your deposit with a banker. However, if your deposit isn't made with a banker (e.g., at an ATM) or we add a hold after you leave the branch, we'll send you a notice to let you know when your funds will be available.
- **Holds for Court Orders:** We may be asked by a legal entity such as a court or government agency to place a hold on your account, which could limit your transactions. We'll send you a letter if this happens.
- **New Accounts:** New accounts may have more restrictions on the availability of funds. See your Funds Availability Policy for details.
- **Returned Deposits:** Even after we've made your funds available for withdrawal, it doesn't necessarily mean the items have been paid by the bank they were drawn on. It can take weeks, even months, for counterfeits or other issues to be discovered. If an item is returned by another bank or not paid, we'll subtract the amount of the item and the Deposited Item Returned fee from your account balance and let you know. When your balance is reduced as a result of a returned or unpaid item, your account could become overdrawn.

## Withdrawals from Your Checking or Savings Account

1. **Writing a Check**
   - When you write a check, please make sure it's complete and filled out properly. Otherwise, we may not honor the check. Always remember to:
     - Write in the current date (not a future date).
     - Write who the check is payable to (the payee).
     - Write the same amount in U.S dollars and in words. If they don't match, we may use either amount to pay the check, which could result in a discrepancy in your account.
     - Sign the check.
   - There are a few important things to keep in mind about how your checks are paid:
     - You should have available funds in your account before you write a check, because it could clear your account as soon as the day you write it. So, know your balance at all times and don't count on a delay of a day or more before we deduct the funds from your account.

- We may pay any check drawn on your account, even if it's over six months old. However, a check more than six months old may not be paid if you give it to one of our bankers to deposit.
- If the person cashing your check doesn't have a Chase deposit or loan account, we may not cash the check. Or, we may cash the check and charge the person a fee.
- An important note: Because of industry changes, some checks are now processed electronically, so the original check may not be available to us. As a result, even if you've asked for your paid checks to be returned with your statement, you won't get these checks back. You also won't be able to see these checks on your statements or view them on Chase Online. You will be able to see some check details in the "Checks Paid" or "Transaction Detail" section of your statement.

2. **Posting Order:** Generally, deposits will be credited to your account first and then we'll pay your items (e.g. checks, debit card transactions, ATM transactions and other debits to your account) from highest to lowest dollar amount each business day. Certain transactions such as wire transfers may post before others.

3. **Insufficient Funds:** If you don't have enough funds available in your account to cover your checks or any other withdrawals, one of these two things will happen depending on your specific account:
   - We pay the check or other withdrawal and charge an Insufficient Funds fee to the account.
   - We return the check or withdrawal unpaid and charge a Returned Item fee to the account. Note: Some payees (the person or company to whom you've written the check) also may charge you a fee for having the item returned to them.

**Note:** If either situation occurs, we'll send you a notice.

Don't allow your account to remain overdrawn. It may cost you more and could result in your account being closed which may affect your ability to open another checking account in the future. Call us promptly if you overdraw your account so we can help.

To help prevent Insufficient Funds and Returned Item fees, talk to a banker to sign up for Overdraft Protection. And don't forget that you can keep track of your balance using Alerts and mobile or online banking. If you don't have enough money in your checking account to write a check or if you

make a withdrawal or a purchase, you can always use one of our banking options to transfer money from another account you have with us.

### 4. Overdraft Protection

Overdraft Protection helps you avoid Insufficient Funds and Returned Item fees and the trouble that results from overdrawing your checking account. Overdraft Protection Transfer fees may apply and will be deducted from your checking account. There is no annual fee for this service so you will only pay a fee when you use it.

If you overdraw an account that has Overdraft Protection, we can automatically transfer funds from your linked savings, credit card or line of credit account to cover the amount that is overdrawn. Remember that you must have available funds in your linked account to cover the amount of the overdraft, plus the transfer fee, or Overdraft Protection won't work.

Talk to a banker about signing up. See the "Overdraft Protection" section in the Deposit Account Agreement for details.

### 5. Stop Payments

After you write a check or make a payment from your account, you can request a stop payment. When you ask us to stop payment, it means you don't want us to pay your check or complete your payment, or you think your check has been lost or stolen. There may be a fee for placing a stop payment.

- **Checks:**
  - We'll ask you for the check number and the amount when you contact us.
  - If you contact us to stop payment on lost or stolen checks, then you later find the checks and want to use them, let us know.
- **Electronic items:** Please call us if you need to place a stop on electronic items, debit card transactions and online bill payments. See the "Stop Payments" and "Stop Payment for Preauthorized Transfers" sections for specific terms.
- **Extensions:** For personal accounts, stop payments are effective for 180 days (terms vary for business accounts; contact us for details). You can place an additional stop payment by contacting us. An additional fee will apply.

### 6. Withdrawal Limitations on Your Savings Account

The Federal Reserve Board limits the number of checks, transfers and withdrawals made from any savings account (Regulation D), and federal regulations require us to monitor these savings account transactions for all of our customers.

**Please note:** This federal regulation does not apply to savings account deposits – only withdrawals. Here is some additional information to help you:

- Each monthly statement period, you can make **unlimited** withdrawals from or transfers between your Chase accounts if you complete them in one of these ways:
  - In person at any of our branches
  - At any of our ATMs
  - By mail
- Each monthly statement period, you can make **six** withdrawals or transfers from your Chase savings or money market savings account **if you** complete them in one of these ways:
  - By check – Only **three of the six** can be by check
  - Overdraft Protection advances
  - Any online payments (Bill Pay) and online transfers, including those on Chase.com
  - Preauthorized payments to any third party
  - Telephone transfers
  - Wires or funds transfers
- There is a Savings Withdrawal Limit Fee for each item over these limits. Note: This is not the same as the Additional Withdrawal Fee that is charged on certain savings accounts.
- If you repeatedly exceed the Regulation D savings withdrawal limits, federal law requires that we change your account to a checking account that offers unlimited check writing and transfers.
- We'll send you a letter if you exceed the above limitations and if we change your savings account to a checking account.

This topic is complicated, so please ask us if you have questions about these withdrawal limits or see the "Withdrawal Procedures and Limitations" section in the Deposit Account Agreement. If you need an account that allows you to make unlimited withdrawals and transfers, ask a banker about our checking account options.

## Debit Cards

Debit cards, sometimes called check cards or banking cards, are a convenient way to access your money. These cards are accepted at millions of locations worldwide and are safer than using cash.

Your card can be used for everyday purchases including gas, groceries, dining out, shopping online and paying bills. Your card can be used at ATMs to withdraw cash or check your account balances. And, at select Chase ATMs you can make deposits and transfer funds between accounts that are linked with your debit card.

- **How we protect your card:**
  - **Zero Liability:** We'll reimburse you for any unauthorized card transactions made at stores, ATMs, on the phone or online when you report the transactions promptly.
  - **Fraud Monitoring:** We use sophisticated Fraud Monitoring tools to review how and where your card is being used. These tools enable us to contact you if we detect abnormal patterns and to block potentially fraudulent transactions.
  - **Security Alerts:** You can set up free e-mail or phone alerts on your account for card activity exceeding an amount you specify.
- **Important tips:** Debit or credit? A merchant may ask you if your purchase is debit or credit. You have two choices. In both instances your purchase will be subtracted from your checking account.
  - **If you choose debit:** Select the Debit or ATM button and enter your PIN. Use this option if you would like cash back with your purchase. You won't earn points or miles for this purchase.
  - **If you choose credit:** Press the credit button and sign the receipt. For some small dollar purchases and when you pay at the gas pump, you may not need to provide a signature. If your card earns points or miles, you must select Credit to earn rewards.

Like writing a check, using your debit card can generate Overdraft fees. You should have money in your account before you make a purchase and record it in your register right away regardless of when the purchase is actually subtracted from your account.

Here is some helpful information about how debit cards work:

- **Authorizations:** Most merchants ask us to authorize your purchase. As with checks, we may authorize the transaction even if you don't have available funds in your account; however, we are not obligated to do so.
- **Holds:** When we give authorization to a merchant, we will reserve or place a hold on funds in your account to pay for your purchase. There are times – for example, at restaurants or for gas purchases, car rentals or hotels – that merchants won't know the exact amount of your purchase when they request the authorization. This means the authorization could be for an amount higher or lower than your actual purchase amount. Keep this in mind, because it could temporarily affect your available balance if your hold amount is different than your actual purchase amount.

- **Daily limits:** For added protection there are daily dollar limits for ATM withdrawals and purchases. Your daily limits were provided when you received your card. If you don't know your limits or would like to change these limits, please call us.

# Important Information About ATM Safety and Safeguarding Your Account Information

- **Play it safe at ATMs** – Overall, use common sense and be aware of your surroundings before, during and after you use an ATM. Here are some additional tips:
  - Choose an ATM that is well-lit.
  - If an ATM looks unusual or altered, don't use it. If you suspect the ATM isn't working properly, cancel the transaction and find another machine.
  - At a walk-up ATM, minimize transaction time by having your card ready to use. At a drive-up ATM, keep your car engine running and lock your doors.
  - Stand between the ATM and anyone waiting to use the machine so others can't see your PIN or the transaction amount.
  - As soon as your transaction is complete, remember to remove your card from the ATM, and then put away your money, receipt and card.
  - Contact the police or a security officer if you see any suspicious activity at the ATM. If you think you're being followed from an ATM, go to a busy area and immediately contact police.
- **Keep your debit or ATM card PIN confidential** – Never give your PIN to anyone, don't write it anywhere and avoid carrying it with you. In addition, to keep your card information safe:
  - Change your PIN from time to time and choose a PIN that others can't easily figure out. For example, don't use your birthday or telephone number.
  - To change your PIN (or if you forget your PIN), visit any branch.
  - A Chase employee will never ask you for your PIN or the numbers from the back of your card.
- **Protect your card as you would a credit card or cash.**
- **Report a lost or stolen card immediately** – The sooner you report a problem, the sooner we can take precautions to ensure your card isn't misused.

6

## Certificates of Deposit (CDs) and Retirement Certificates of Deposit (Retirement CDs)

If you're able to set your money aside for a specific period of time, consider CDs, which provide a fixed, predictable rate of return and the security of FDIC insurance.

Here are a few things you should know about CDs:

- **Automatically Renewable CD:** An automatically renewable CD will automatically renew on the maturity date for the same term. The interest rate in effect at the time the CD renews into the new term will be applied to the account. See the "Specific Terms for Certificates of Deposit, Maturity Conditions" section for more details.
- **Single Maturity CD:** A single maturity CD will not automatically renew on the maturity date and won't earn or be paid interest after that date. See the "Specific Terms for Certificates of Deposit, Maturity Conditions" section for more details.
- **Term:** The term is the length of time you agree to leave your money in the account.
- **Maturity Date:** The maturity date is the first day you can change the term, rate or balance of your CD without paying an early withdrawal penalty. See the "Specific Terms for Certificates of Deposit, Early Withdrawal Penalties" section for details.
- **Grace Period:** The grace period is the 10 days after your maturity date that you can make changes to your CD's term, rate or balance before it automatically renews for the same term.
- **Interest Rate:** The interest rate is the rate applied to your CD for its term.
- **CD Special Interest Rate:** A CD Special interest rate applies only to the initial CD term. If your CD has a CD Special interest rate, at the time of renewal your CD will automatically renew for the same term at the standard (non-special) interest rate in effect on the renewal date or for the Relationship interest rate if you qualify.

## Personal Information at Account Opening

Federal law requires all financial institutions to obtain, verify, and record information that identifies each person or business that opens an account.

- When you open a personal account, we will ask for your name, residential address, date of birth and social security number, which will allow us to verify your identity.

- When you open a business account, we will ask for your business name, tax identification number and business address, which will allow us to verify your business. We will also ask for your name, residential address, date of birth and social security number, which will allow us to verify your identity.

## Inactive and Unclaimed Accounts:

- Each state has laws that govern when accounts are considered "abandoned," and when we're required to send a customer's funds to the state.
- We encourage you to make sure your accounts remain active so you receive regular statements, have the full use of your accounts, and avoid the potential of having your account assets transferred to the state as "abandoned property".
- We'll send you a letter if it's possible that your account assets may be transferred to the state.

## Spanish Language Preference

Some of our documents are also available in Spanish. Please ask a banker if you are interested in this option. If there is a discrepancy in the English and Spanish version of any of our documents, the English version will apply to the account.

# SECTION II:

# Deposit Account Agreement

This agreement governs personal and business deposit accounts identified in this Deposit Account Agreement at JPMorgan Chase Bank, N.A. (the "Agreement"). By signing a services application, deposit account signature card, or by otherwise opening or maintaining a checking, savings or certificate of deposit (including retirement certificates of deposit) account with us, you accept and agree to be bound by the terms and conditions of this Agreement. However, if your account is maintained with a business unit of the Bank that provides you a different deposit agreement, or if you contract for services that require your consent to a different deposit agreement, your account will be governed by that agreement.

As used in this Agreement, "we," "us," "our" and the "Bank" mean JPMorgan Chase Bank, N.A. Your "Account" means each deposit account you have with us that is governed by this Agreement. "You" or "your" means each person or entity in whose name the

7

Account at the Bank is maintained or who exercises an ownership interest therein, as well as any assignee or successor in interest to the Account. Your "State" means the U.S. state where you opened your account, or the state where you reside if you opened your Account by mail, internet, or other remote means and you reside in a state where we have branch offices. However, if you opened your Account by remote means and you do not reside in a U.S. state where we have branch offices, your "State" shall be the State of Ohio, where we are headquartered.

This Agreement includes the following disclosures applicable to the Bank's personal and business deposit accounts that the Bank has provided to you: (1) account features, (2) Additional Banking Services and Fees, (3) Funds Availability Policy, (4) the rate sheets for interest bearing accounts, and (5) any additional disclosures regarding your Account that the Bank will provide to you. Fees mentioned throughout this agreement can be found in the product disclosures and Additional Banking Services and Fees disclosures referenced above.

# General Account Terms and Conditions

## Deposits or Cashed Items:

Checks, drafts and other negotiable instruments, including substitute checks (see the section of this booklet entitled Check 21 – Substitute Check and Your Rights) (collectively "checks") deposited to your Account or cashed, automated clearinghouse ("ACH") entries and all other types of external and book-entry funds transfers (checks and funds transfers collectively referred to herein as "items"), may be charged back against the Account (or an Account for split deposits) or any other Account of yours at the Bank if we are informed that the item is being or has been returned unpaid (or, for checks drawn on other accounts with us, the check is dishonored by us for any reason), without regard to whether such return or dishonor is timely. When a deposited or cashed item is returned, you will be charged a Deposited Item Returned fee. We may charge your Account whether or not the check is returned to us, and whether or not we can return the item or a copy to you. Even if we verify a deposited or cashed check and tell you that the check has been paid, that will not release your liability as an endorser. This right shall extend to any check or other item deposited into your Account or cashed, that is finally paid and then is returned because a claim is made that the check or other item was altered, forged, unauthorized, has a missing signature or should not have been paid for any reason. In lieu of charging your Account we may withhold an amount equal to such check or other item from your Account until a final determination of the validity

of such claim has been made. We have no duty to return a check that has been charged back to an Account if that Account has become overdrawn. We are not required to give you next-day notice if a deposited or cashed item is dishonored.

Any check deposited to your Account that lacks an endorsement may be, or may be deemed to be, endorsed by us on your behalf. With respect to any such check, our rights and your liabilities shall be determined as though you actually endorsed and deposited the item. Further, any check deposited to your Account that bears your stamped or facsimile endorsement shall be deemed to bear your actual endorsement whether such endorsement was affixed by you or by someone having no authority to supply your endorsement. You agree to assume responsibility for and to indemnify us for any loss we may incur as a result of your failure to comply with the endorsement standards set forth in our Endorsement Standards section of this Agreement. If you deposit a remotely created check, you guarantee that the check was authorized by the account holder for payment in the amount shown. Remotely created checks are created when an account holder authorizes a payee to draw a check on the account, but instead of the account holder's actual signature, the check identifies that the account holder authorized the check.

We may rely on the account number on any deposit record received, even if the record identifies a party different from the entity identified by name in the record, and we have no duty to detect any such inconsistency in identification.

We may return or refuse to accept all or any part of a deposit or credit to your Account at any time and will not be liable to you for doing so even if such action causes outstanding items to be dishonored and returned. Returned or refused deposits (or the legal equivalent of the deposited item) will be returned to you. In addition, you will be solely responsible for any loss or liability you sustain in connection with the deposit of substitute checks.

We will not give you next day notice of receipt of an electronic deposit to your Account but will provide such notice to you on your next periodic Account statement. You may call us to confirm an ACH or wire transfer deposit.

## Credits for Deposits:

A receipt may be provided or made available upon request for all deposits to your Account (except for remote deposits, e.g., lockbox, night depository services and certain funds transfers). However, the amount on your deposit receipt is based solely on your deposit ticket. Funds from your deposits to your Account may not be made immediately available. We shall not be construed to have received for deposit checks sent by

mail or placed in the night depository until we have either received actual delivery from the U.S. Postal Service or have removed the checks from the depository. Checks placed in such depository will be removed not later than the next business day. All deposits made by mail and addressed to a Bank location without using a specific branch name and street address will be considered received by the Bank's National Bank-By-Mail facility in Louisville, KY as of the date such deposit is received by such facility. For checking accounts, funds will be made available according to Federal Reserve Regulation CC and our Funds Availability Policy. Credits for all deposits are subject to final verification and, after review, we may make adjustments to your Account for any errors, including any errors appearing on your deposit ticket, but have no obligation to do so for discrepancies under ten dollars. In addition, the availability of funds for withdrawal does not mean that the deposited check or other item is "good," has "cleared" or has been paid by the paying bank, or that the item will not be returned unpaid and your Account subsequently debited, notwithstanding the passage of any period of time or any representation or belief to the contrary. We may accept credits to your Account that have been originated by third parties (e.g., ACH credits, wire transfers). However, we may reverse any credit to your account that the originator of such deposit has informed us was in error, or was intended for another account, without investigating whether such credit was not properly payable to you.

We need not accept for deposit items drawn on a non-U.S. bank or items payable in a foreign currency and may instead accept such items on a collection basis, even after we have taken physical possession of such items. If accepted on a collection basis, we will not be obligated to credit your account for such items until we have received final payment. The actual credit for items payable in a foreign currency will be at the exchange rate at the time of final collection in U.S. dollars. Regardless of whether such items are accepted for deposit or on a collection basis, our Funds Availability Policy will not apply.

## Collection of Deposits:

You agree that we act only as your collecting agent in receiving items for deposit or collection and assume no responsibility beyond reasonable care. We will use reasonable care in the selection of collecting agents but will not be liable in case of their failure or negligence or for losses in transit.

You agree that we, and each of our correspondents, may send checks subject to collection, directly or indirectly, to any bank, depository, maker or drawee in accordance with our usual custom and may accept checks, drafts or credits as conditional payment.

You agree to use reasonable care to assist us in locating or obtaining replacements of items lost while in our possession. We may agree with other banks and clearing houses to vary procedures regarding the collection or return of items, and deadlines to the extent permitted by applicable law.

## Withdrawal Procedures and Limitations:

In accordance with the features of your Account, you agree that we may charge your Account for any withdrawal or transfer that you make or authorize another to make. We may, as a condition of withdrawal, require you to provide us with identification or information acceptable to us and/or your signature on certain withdrawal documents signed in the presence of our personnel. If you request to withdraw large amounts in cash, we may place reasonable restrictions on the time and method of your withdrawal and may require that you sign a document releasing us from any liability in case you are robbed or assaulted. We may refuse the withdrawal if you do not agree with these conditions.

Federal regulations impose limitations on transfers from savings accounts and we are required to monitor your compliance with them. You may make no more than six (6) preauthorized withdrawals (including, but not limited to, withdrawals made by ACH, telephone, Internet, or wire) monthly, no more than three (3) of which may be by check or similar order payable to a third party, from your savings account. These limitations do not apply to withdrawals made through Automated Teller Machines, over-the-counter, mail or messenger. We will impose a Savings Withdrawal Limit Fee for each transfer that exceeds these limits. In addition this transfer may also invoke an Additional Withdrawal fee for Chase Savings accounts for having exceeded applicable withdrawal limits. If you continue to exceed any transfer limits on your Account after we have notified you of any such transfer violation, we will close your Account and transfer the funds to another deposit account type selected by us for which you are eligible or eliminate your Account's transfer and check privileges.

For all savings accounts, interest bearing checking accounts and holding sub-accounts, we reserve the right to require seven (7) days prior written notice of withdrawal. In addition, any personal checking account for which a one time promotional payment to or for the account is made by us as a premium or other consideration upon account opening will cause such account to be considered an interest bearing checking account for this Agreement (and, for statutory purposes, a NOW account) and subject to the potential seven-day withdrawal notice requirement, even though such account may not accrue interest on a periodic basis.

## Payment and Deposit of Checks:

You agree not to issue incomplete, postdate or conditional checks or present them for deposit to your Account. Also, we have no duty to discover, comply with or have any liability for accepting any incomplete, postdated, conditional checks or checks more than six months old, even if you have provided us with notice describing this check. *We may charge a person who cashes your check a fee, or refuse to cash your check, if that person is not a deposit or loan customer of ours.*

We have no duty to honor and we may disregard any information on a check other than the identification of the paying bank and payee, the amount (we may rely upon either the numeric amount or the amount in words if contradictory) and any MICR encoded information, and specifically have no duty to visually inspect signatures. We may construe as "or" any symbol, mark or word (other than the word "and") used as a connective, or may imply an "or" in the absence of any connective, on the payee line of any check containing multiple payees. In addition, for both personal and business Accounts, we may debit an Account based on a single signature, and a multiple-signature requirement is for the customer's internal use only, notwithstanding any communication to us to the contrary.

You agree that if you utilize an automatic check writing service which operates through the use of a personal computer, employ the use of a facsimile signature or do not otherwise provide your personal signature on a check, you agree that you shall have the sole responsibility for maintaining security of any such computer, stamp or device by which your signature is affixed and that you shall bear the entire risk of unauthorized use of any such device or of any facsimile signature that reasonably resembles the signature you use, whether or not you are negligent. You also agree that the treatment of each check presented against your Account through the use of such a service and our rights and obligations with regard to such check will be the same as if the check was signed or initiated personally by you. You further agree to indemnify and hold us harmless from and against any and all loss, cost, damage, liability or expense (including attorney's fees) we may suffer or incur as a result of the unlawful use, unauthorized use or misuse by any person of any such device or of any facsimile signature that reasonably resembles the signature you use.

Your Account may be debited on the day a check is presented by electronic or other means, or at an earlier time based on notification received by us that such check drawn on your Account has been deposited for collection at the Bank or at another financial institution. A determination of your Account balance for purposes of making a decision to dishonor a check for insufficiency of available funds may be made at any time between the receipt of such presentment or notice and the time of return of the check, and no more than one such determination need be made. If the Bank dishonors any check, we shall treat any subsequent representment the same as the original presentment in all respects (including imposing an additional Insufficient Funds or Returned Item Fee if applicable), and shall have no duty to take any steps to prevent representments of such checks.

## Check and Forms Specifications/Protection of Documents:

All checks, withdrawal forms, deposit slips and transfer instructions used in connection with your Account must be on forms obtained through or approved by us. You agree to maintain adequate safeguards to ensure the authorized use of the forms you retain, and agree to notify us immediately if you become aware that any checks or other forms are lost or stolen. We are not responsible for losses you may suffer due to improper printing on forms not obtained through or approved by us, your failure to maintain adequate safeguards against unauthorized use, or your failure to issue checks in a manner so as to prevent unauthorized completion, alteration or addition. You agree that we may refuse to accept for deposit or to process any check or other item that is presented to it in a form that cannot be processed or photographed using equipment that we regularly use in our normal operations.

## Insufficient Funds:

We have no obligation to pay or honor any item or withdrawal request unless it is drawn or requested against available funds credited to your Account at the opening of business on the day the item is presented for payment or the request is received, even if we paid an item or honored a withdrawal request drawn or requested against insufficient funds in the past. If we pay an item or honor your request that overdraws your Account, a deposited item has been returned unpaid, or for any other reason your Account has become overdrawn, you agree to pay the amount of the overdraft together with any fee and accrued interest identified in this Agreement immediately, whether or not you signed or requested the withdrawal or participated in the transaction creating the overdraft.

You hereby authorize us to apply any subsequent deposit to the Account against the amount of any overdraft and resulting fees or charges, including any federal or state benefit payments that you choose to deposit in any Account (including direct deposit of Social Security). You understand and agree that if you do not want your benefits applied in this way, you may change your direct deposit instructions to the benefits payor at any time.

Items will be posted to your Account in highest to lowest dollar amount each business day (Monday

through Friday, federal holidays not included). However, certain transactions like wire transfers may be posted before others. We reserve the right to change this posting order without notice. We may assess a fee for any item or withdrawal request, such as a check, in person withdrawal, ATM withdrawal, or other electronic means, when there are insufficient funds in your Account based upon the posting method identified above, whether or not the item is paid or the request honored, or whether or not an overdraft to your account has occurred. We may assess an Extended Overdraft fee for overdraft balances that are not promptly repaid and/or charge interest for any overdraft on your Account. You agree to pay all costs and expenses, including attorney's fees, incurred by us in the collection of any overdraft.

### Returned Item and Insufficient Funds Fees:

Insufficient Funds and Returned Item Fees will be assessed based on the number of "Occurrences" in the previous twelve (12) months plus the current month. An Occurrence happens any business day that at least one item is presented or withdrawal request is made against an account with insufficient funds, whether or not we honor any or all of the items or withdrawal requests. In general, the more Occurrences you have on your account, higher fees will be charged on each item. For example, on your second Occurrence you may pay a higher per item fee than you paid on the first Occurrence.

It is your responsibility to manage your account to avoid having insufficient funds. See a banker to learn about overdraft protection options available to you, or see the Overdraft Protection Services for specific information about this service. We also offer Personalized Alerts to keep you informed about the balance and transactions in your account.

### Specific Terms for Certificates of Deposit:

The standard minimum deposit amount to open a Certificate of Deposit ("CD," which term shall include Retirement CDs unless otherwise identified below) is $1,000. Subsequent deposits are not permitted except during the ten-day grace period. By opening your CD, you have agreed to keep the funds on deposit for the agreed upon stated term.

*Maturity Conditions.* For automatically renewable CDs, your CD will automatically renew for the same time period as the initial term, and thereafter for successive like periods of time, with an interest rate then in effect on the renewal date for like term CD to be applicable during such time period. This will not apply if you withdraw your funds during the ten-day grace period following the maturity date. Withdrawals made during the grace period are not subject to early withdrawal penalties described below. If your CD is redeemed during the ten-day grace period, it will not

earn interest after the maturity date. For single maturity CDs, your CD will not automatically renew on the maturity date. No interest is earned or paid after the maturity date.

*CD Special Interest Rates.* If your CD has a CD Special interest rate, that rate applies only to the initial CD term. At the time of renewal, your CD will automatically renew for the same term at the standard (non-special) interest rate in effect on the renewal date or for the Relationship interest rate if you qualify.

*Early Withdrawal Penalties.* **There is a penalty for withdrawing funds prior to the maturity date.** If the term of the CD is less than 365 days, the early withdrawal penalty is equal to $25.00 plus 1% of the amount withdrawn. For terms of one year or more, the early withdrawal penalty is equal to $25.00 plus 3% of the amount withdrawn. If the withdrawal occurs within seven (7) days after the date of deposit, the amount of the early withdrawal penalty shall be calculated as above, but in no event shall it be less than the accrued interest. Early withdrawal penalties may require a reduction in the principal amount if the amount of accrued and unpaid interest on the deposit is less than the penalty. Early withdrawal penalties will be waived under the following circumstances:

- Withdrawal of accrued or paid interest;
- Withdrawal due to the death of a CD owner (including Totten Trust) or a grantor of a revocable family/living trust;
- Withdrawal due to the disability of a CD (excluding Retirement CD) owner*;
- Withdrawal due to the disability of a Retirement CD owner;
- Withdrawal due to the judicial determination of legal incompetence of a CD owner;
- Re-titling of a CD (excluding Retirement CD) to transfer ownership of funds into a living trust without moving funds from the Bank and where no change in term or rate occurs;
- Re-titling of a Retirement CD in a Coverdell Education Savings Account to change beneficial owner without moving the funds from the Bank and where no change in term or rate occurs;
- Withdrawal by a Retirement CD owner who is 59½ or older where the funds are taken as a distribution by the Retirement CD owner via cash, check, deposit or transfer to a non retirement account. Excludes transfers to another financial institution. (The withdrawal will be reported to the IRS as a retirement distribution.);
- Withdrawal by a Retirement CD owner who is under age 59½ for these reasons as defined by section 72 (q), (t) or (v) of the Internal Revenue Code:
  – Payment of health insurance premiums after separation from employment*;

- Payment of medical expenses in excess of 7.5% of the retirement owner's adjusted gross income*;
- Payment of qualified education expenses*;
- Payment of first-time home purchase expenses*;
- Payment of retirement funds directly to the IRS due to IRS levy*;
- Substantially equal periodic payments*;
- Withdrawal by a Retirement CD owner who is revoking their Traditional or Roth IRA within seven days of plan establishment (must forfeit accrued interest);
- Withdrawal from a Retirement CD of an excess annual retirement contribution and any attributable earnings*;
- Withdrawal by a Retirement CD owner converting a Traditional IRA contribution to a Roth IRA contribution without moving funds from the Bank and where no change in term or rate occurs;
- Withdrawal by a Retirement CD owner recharacterizing (changing) a Traditional IRA contribution to a Roth IRA contribution or vice versa without moving funds from the Bank and where no change in terms or rate occurs;
- Withdrawal of a Retirement CD in a Money Purchase Pension Plan or Profit Sharing Plan by a Retirement CD owner for the purpose of a Direct Rollover to a Traditional IRA without moving funds from the Bank and where no change in terms or rate occurs.

*Except during the first seven days following account opening or for withdrawals made within six days of a previous withdrawal, in which case the penalty must always be applied.

## Stop Payments:

You may stop payment on a check drawn on your Account if we have not accepted, certified, made final payment on or otherwise become accountable for the item. Any joint owner may order us to stop payment on any check drawn on your Account. A Stop Payment fee will apply. To stop payment on a check, please call us at the phone number listed in the address and telephone numbers section.

You must provide us with the precise Account and check number/amount to allow us to identify the check based upon our computer retrieval system standards. A stop payment order shall become effective not later than one full business day after we have received such information, which you agree is a reasonable time. If a cashier's check, teller's check ("official check") or certified check is lost, destroyed or stolen, you may assert a claim to the amount of the check if you give us a declaration of loss statement in a form acceptable to us and the check has not been presented for payment for 90 days from the issue date or in the case of certified checks, from the date of acceptance.

For personal Accounts, an oral or written stop payment order is effective for 180 days, and may not be extended. However, you may place an additional stop payment order at any time, in which case such order shall replace the prior instruction, and shall be effective for 180 days from the day such additional order was placed. An additional stop payment fee will be charged. We will not send a confirmation of your stop payment order. For business Accounts, an oral or written stop payment may be placed for two lengths of time. You may place a stop payment order to be effective for 180 calendar days or you may place a stop payment order to be effective for one year and then renewable annually, at your choice, for six additional years. We may send you a written confirmation of your stop payment order. If any of the information on the confirmation is incorrect, you must notify us within the time period stated on the confirmation. If you do not do so, the information will be presumed to be correct. You will receive a 60 to 90 day advance notification of stop payments scheduled for renewal on your business Account statement. You may request at that time to discontinue the renewal of a stop payment by indicating the stop payment you wish to revoke and returning the notice portion of the statement, with an authorized signature, to the address provided. For personal and business Accounts, when the effective period of the stop payment order expires, we have no duty or obligation to notify you before we pay the item.

If you stop payment on a check drawn on your Account, you may still be obligated to pay such item to any party entitled to enforce it pursuant to applicable state law.

## Statements:
### (for Retirement CDs and Retirement Money Market Accounts refer to your IRA/CESA or QRP plan document)

We will maintain appropriate records of your Account. An Account statement for checking and savings accounts will be sent to you at your current address listed on our records on a monthly basis, unless there have been no deposits or withdrawals made to your accounts within a 30 month (12 months in Texas) period, in which case annual statements will be sent, unless otherwise specifically indicated in the personal accounts or business accounts sections of this Agreement. Statements will be sent via ordinary U.S. mail, unless you and the Bank agree otherwise. We will send only one statement per Account, even if that Account has more than one owner. You agree that sending the Account statement as described qualifies as sending the Account statement to all owners of the Account, even if all owners do not have access to the mailing address of record for the Account.

12

We may change your postal address of record if we receive an address change notice from the U.S. Postal Service or if we receive information from another party in the business of providing correct address information that the address in our records no longer corresponds to your address.

As used in this Agreement, the monthly statement period means the time period covered by your Account statement. This time period may or may not correspond to a calendar month but in most cases will not exceed 32 days or be less than 28 days. The specific dates covered by your Account statement will be set forth in the statement.

## Check Enclosure Options:

If, at your election or your Account features so require, we retain your cancelled checks and do not return them with your Account statement, you acknowledge that the original cancelled checks may be destroyed after a reasonable period of time as determined by us. You agree that by maintaining the original check or a copy thereof on your behalf, we have otherwise made the check available to you in a reasonable manner. You may request a copy of any cancelled check and a service charge may be imposed for each copy provided. If for any reason we cannot return a copy of your check or satisfy your needs through other means, you agree that we will not be liable for more than the face amount of the check.

If available, when we retain your cancelled checks, you may request that we include images of the front of your cancelled checks with your statement ("Image Statement"). However, you may elect to neither have your cancelled checks nor images thereof included with your statement ("Check Safekeeping") and unless the terms of your Account require Check Safekeeping, you may elect to have your checks returned with your Account statement ("Check Enclosure") rather than receiving images thereof.

Some merchants, utilities and other billers may elect to convert your check into an electronic funds transfer. Since we do not receive your check, neither a cancelled check nor its image is available from us. Additionally, we may elect to receive electronic images from other banks or financial institutions in lieu of original checks. If we receive an electronic image for payment, this image will appear with other cancelled checks on your Image Statement, however the cancelled check is not available from us.

If you have elected to have your checks returned in your statement for the first checking account listed on your statement, then all other checking accounts listed in your statement will require Check Safekeeping (for business accounts, you may elect Check Enclosure option for all checking accounts). If the first checking account election is Image Statement, then other checking accounts will default to Image Statement, unless Check Safekeeping is elected or required by the terms of that account. If the first checking account has Check Safekeeping, then all other identified checking accounts will require Check Safekeeping as well.

## Notification of Errors, Forgeries and Unauthorized Signatures:
### (for Retirement CDs and Retirement Money Market Accounts refer to your IRA/CESA or QRP plan document)

You agree to reconcile your statement promptly upon receipt. If we honor a check or other item drawn on or posted to your Account that is altered in any way or was not drawn or otherwise authorized by you ("unauthorized item") or if your Account statement contains any errors, you agree to notify us in writing of such unauthorized item or error within 30 days of the date on which the unauthorized item, or the Account statement that contained a description of the unauthorized item or error, was mailed, transmitted or otherwise made available to you. You must notify the Bank in writing of any unauthorized, improper, or missing endorsements within six (6) months after the Account statement is mailed, transmitted or made available to you. You agree to provide us with all information necessary for us to investigate the alleged error or unauthorized item, associated police reports, supporting affidavits, and testimony we reasonably request. Failure to report an unauthorized item or error, or that you did not receive your scheduled statement, within the 30-day time frame set forth above, or to abide by the conditions set forth herein, shall be deemed conclusive proof that you failed to exercise reasonable care and promptness in examining the items and statements of the affected Account and in notifying us of the unauthorized item or error. You agree that such items and errors shall therefore be fully enforceable against you and you shall have no claim against us for same and shall be barred from bringing any action against us that is in any way related to the unauthorized item or errors.

Notwithstanding the foregoing, the Electronic Funds Transfer Services section of this Agreement governs the reporting of errors on consumer electronic funds transfers governed by Federal Reserve Board Regulation E. You also have those rights afforded to you under federal law for substitute checks. Please see the Check 21 section of this Agreement for more information.

## Sub-Accounts:

For accounting purposes, all checking accounts consist of two sub-accounts: a transaction sub-account to which all financial transactions are posted, and a holding sub-account into which available balances above a

preset level are transferred daily. Funds will be retransferred to your transaction sub-account to meet your transactional needs; however, all balances in the holding sub-account will be transferred to the transaction sub-account with the sixth transfer in any calendar month or monthly statement period.

Both sub-accounts are treated as a single account for purposes of your deposits and withdrawals, access and information, tax reporting, fees, etc.

## Linked Accounts

For checking and savings accounts, you may elect to have these accounts appear on a single statement. Since accounts with at least one common owner can be included on an account statement, you agree that information regarding your Account may be made available to any other owner on any of the accounts that are identified on that combined statement.

Many checking accounts permit you to link other accounts you may have with us or our affiliates to help waive the monthly Service Fee for that checking account based upon the balances you keep in those other accounts. These other accounts need not be included on your statement for those pricing benefits to apply, and accounts that appear on your combined statement are not automatically linked for purposes of pricing. If you have multiple checking accounts listed on your statement, pricing benefits may only apply for the first checking account listed. In addition, balances held in any particular account may only be used for pricing benefits applied for one checking account.

Linking accounts is always at our discretion. If you choose to link your personal accounts to other accounts for which you serve as trustee or custodian (fiduciary), your personal account may receive a financial benefit. Under fiduciary law, any financial benefit you receive is considered a violation of fiduciary duties. We bear no responsibility for your decision to link fiduciary and personal accounts. You should carefully consider this decision, and consult with your legal advisor if necessary.

**Note:** we will not automatically place accounts on one combined statement or link accounts for pricing; you must take authoritative action to do so.

## Interest:

### Checking and Savings Accounts

Your Account, if designated as interest bearing, will be a variable rate account on which we may change the interest rate and annual percentage yield from time to time at our discretion without notice to you. We do not impose a limit on the amount the interest rate and annual percentage yield on your Account may change. If you have requested your Account not to accrue interest on a periodic basis, we will not establish or maintain an interest rate for the Account until such time as you have requested the Account to begin earning interest.

Interest begins to accrue no later than the business day we receive credit for the deposit of non-cash items. For purposes of accruing interest, we use the daily balance method. This method applies a daily periodic rate to the principal balance in your Account each day, which may be based either on collected or ledger balances as set forth in the product features for your Account. The collected balance is the balance of all deposits in your Account on which we have received credit for the deposited funds (determined by the availability schedule of our Federal Reserve Bank for non-cash items). The ledger balance is the balance in your Account without regard to credit or availability. Interest for Chase Retirement Money Market Accounts with interest distributions will not compound and will credit on the distribution date. For all other interest bearing Accounts, interest is credited and compounded monthly. On personal Accounts, interest is computed on a 365-day basis. We reserve the right not to pay interest on any deposited item that is returned to us unpaid.

The interest rate and annual percentage yield applicable to your Account on the date your Account is opened will be set forth on a separate "rate sheet" or other interest rate disclosure provided to you when your Account is opened. That interest rate disclosure is considered a part of this Agreement.

### Certificates of Deposit

We use the daily balance method to calculate interest on your CD. This method applies a periodic rate each day to the principal balance. Interest begins to accrue on the business day you deposit cash or non-cash items. Interest for CDs is calculated on a 365-day basis, although some business CDs may calculate interest on a 360-day basis. The APY disclosed on the face of your Deposit Receipt, which is considered part of this Agreement and, if applicable, on the maturity notice, assumes interest will remain on deposit until maturity. On maturities of more than one year, interest will be paid and reported to the IRS at least annually (excludes Retirement CDs). A withdrawal will reduce earnings.

## Record Retention:

We shall abide by federal and applicable state record retention laws and may dispose of any records that have been retained or preserved for the period set forth in these laws. Any action by or against us based on, or the determination of which would depend on, the contents of records for which a period of retention or preservation is set forth in these laws shall be brought within the time for which the record must be retained or preserved, unless applicable law provides a shorter

limitation period. Any action against us on an automatically renewable CD must be brought within the retention period applicable to that CD based on the stated maturity date in the most recent record evidencing the existence and term of the CD.

## Fees and Service Charges:

You agree to pay the monthly service fee, transaction fees, fees or interest charges for insufficient funds and stop payments, and all other applicable service charges or fees identified herein as applicable to your Account, or which may be otherwise mutually agreed upon by you and the Bank. You authorize us to charge your Account for these fees and service charges at any time whether or not such fees or charges will result in an overdraft of your Account or, where there are not sufficient funds in your Account to cover your fees and service charges, to bill you separately. You acknowledge and agree that the funds in your Account used to pay such fees and service charges may include any federal or state benefit payments that you choose to deposit in any Account (including direct deposit of Social Security). You understand and agree that if you do not want your benefits applied in this way, you may change your direct deposit instructions to the benefits payor at any time.

## Form of Account Ownership:

### Personal Accounts

Where only one individual is designated or appears on a signature card as the owner of such account, then we may treat the Account as a solely owned account. In the event of your death or adjudication of incompetence or interdiction, you agree that we have the right to honor checks or other items drawn against your Account until ten days after we receive actual written notice of your death, incompetence or interdiction. We may restrict access to your account upon notice of your death or adjudication of incompetence or interdiction until the appropriate documentation reasonably requested by us, including a death certificate, is provided by your executor, administrator or other representative of your estate or person. To the extent and under the circumstances permitted by the laws of your State, upon receipt of actual written notice and proof of your death, the balance in your Account will be paid to the person or entity you designate to "pay on death" ("POD") or you designate as a POD payee or beneficiary on your Account's signature card or on a form provided by us.

Unless your signature card or account opening documents so designate, where two or more individuals are designated or appear on a signature card as owners of such Account, then as between them, we will treat the owners as joint tenants with rights of survivorship. For any joint account where a joint owner has died, we reserve the right not to release funds in the account until all legal documents are delivered to us. You agree to notify us of the death of any joint owner and to reimburse us for any tax we may be required to pay by reason of our payment or release of funds in the account to you.

Any joint owner may close the account. We may, at our sole discretion, act upon such other instructions of any joint owner, including withdrawing funds or adding or removing any signatory or other joint owner to or from the account, without the signature of the other joint owner(s). However, we are under no obligation to observe such instruction, and may do so or refuse to do so without liability. We may also pay all or any part of the funds in the account to any of the joint owners upon request of that joint owner or to a court or governmental agency upon receipt of a garnishment order, tax levy or similar legal process identifying any one of the joint owners.

All joint owners will be jointly and severally liable for all overdrawn accounts, whether or not that particular owner initiated a withdrawal request or other transaction drawn against insufficient funds which we honored, withdrew funds credited to an account which were made available based upon a deposited item which was subsequently returned unpaid, or whether such owner received benefit from a transaction which resulted, directly or indirectly, in such overdraft.

We may refuse to accept items for deposit or to pay withdrawals on the signature of any one of several joint account owners if we receive a written request not to do so from any joint account owner. After we receive such written request, we may refuse to honor any check, draft or demand upon the account by any of the joint account owners, including the one providing the request to us, unless all of the joint account owners concur in the withdrawal of funds from the account. In the event we receive such a written request, we shall be relieved of any and all liability to every joint account owner for failure or refusal to honor any check, draft or other demand for payment or withdrawal unless all of the joint account owners join in the drawing or other request. This shall not affect transactions previously completed. Each joint owner appoints each of the others as his/her agent and attorney in fact with power to endorse and deposit items payable to him/her in the joint account. If you establish a joint account without the signature of the other joint owner, you agree to hold us harmless for our reliance upon your designation of the other as a joint owner.

If you have opened the account as a Representative Payee for receipt of certain federal benefits on behalf of a beneficiary, you agree that you will cause to be

deposited into the Account only those benefits payable to the beneficiary. The Bank is neither obligated to ensure that only those eligible federal benefits are deposited into the Account, nor does it have a duty to determine whether any withdrawals or transfers from the Account are for the benefit of the beneficiary. If the beneficiary dies, you agree to (a) promptly notify the Bank, (b) no longer permit further deposits to the Account, (c) promptly notify the Bank if any such deposits are made, and (d) maintain sufficient available balances in the Account from which any benefit payments may be reclaimed by the applicable U.S. Government agency. If the Bank is unable to debit the Account or if there are insufficient available funds in the Account from which to debit the full amount of any reclamation by the government, you authorize the Bank to offset any account owned by you or the beneficiary for any amounts reclaimed by the applicable U.S. Government agency.

If the account is opened as an estate account, trust account, guardianship or conservatorship account, or other similar type of account, we reserve the right to require such documents or authorizations as we may reasonably deem necessary or appropriate to satisfy us that the person requesting or directing the withdrawal of funds held in the account has the authority to withdraw such funds. We shall be held harmless for refusing to pay or release funds in the account where such refusal is based on the failure of the person requesting or directing the withdrawal to provide documents or authorizations requested by us. If you establish your account as "in trust for" ("ITF") or as trustee for a third person without presenting formal trust documents, then we may treat the account as a Totten Trust account or as otherwise required by the laws of your State. If you have opened an account as custodian for a minor beneficiary under a state's Uniform Transfers/Gifts to Minors Act, you will not be allowed to pledge the account as collateral for a personal loan to you or cash checks against the account, except as otherwise permitted by law. Notwithstanding anything to the contrary, the relationship between you and the Bank is one of debtor/creditor, not fiduciary, even if the account is titled as a "fiduciary" account with that role being played by you.

You agree that if your Account is identified as one offered only to individuals or unincorporated non-business associations, it shall not be used for a business purpose.

### Business Accounts

Where a corporation, unincorporated association or limited liability company, partnership, including a limited partnership, limited liability partnership, or joint venture, government entity or sole proprietor (collectively, the "business") is designated or appears on a signature card as the owner of such account, then the account is payable only to or on the order of the business, and not to any individual director, shareholder, member or partner thereof except as they may be a payee on a check or other item drawn on your Account. You further represent and agree that the business has taken all action necessary to open and maintain banking accounts at the Bank and that all resolutions and/or other documentation delivered to us in connection with the account are true, accurate, complete, and will be kept up to date and may be conclusively relied upon by us. You agree to notify us in advance of any change in your form of ownership. You also agree that we are not obligated to cash checks payable to you or to accept "less cash" deposits. Notwithstanding anything to the contrary, the relationship between you and the Bank is one of debtor/creditor, not fiduciary, even if the account is titled as a "fiduciary" account with that role being played by you.

You agree that each eligible signer is authorized to endorse for collection, deposit, or negotiation any and all checks, drafts, notes, bills of exchange, certificates of deposit, and orders for the payment or transfer of money between accounts at the Bank and other banks, either belonging to or coming into the possession of the business. Endorsements "for deposit" may be written or stamped. We may accept any instrument for deposit to any depository account of the business without endorsement or may supply the endorsement of the business. The person(s) so designated is authorized to sign any and all checks, drafts and orders drawn against any designated account(s) of the business at the Bank. We are authorized to honor and pay all checks, drafts and orders when so signed or endorsed without inquiry as to the circumstances of issue or disposition of the proceeds even if doing so causes an overdraft or increases an overdraft and regardless of to whom such instruments are payable or endorsed, including those drawn or endorsed to the individual order of any such person so listed.

In addition, each eligible signer is authorized to act for and on behalf of the business in any matter involving any Account of the business, including the authority to instruct us to close the Account, and is further authorized to sign and implement for and in the name on behalf of the business, as they, or any of them see fit, the terms of all agreements, instruments, drafts, certificates, or other documents relating to any depository accounts or other business including, but not limited to, night depository agreements, funds transfer agreements or safe deposit agreements.

### Telephone Requests:

You agree that funds in any of your Accounts with us can be transferred, upon the telephone request of any signer on the Account, to another account with us

16

or to any other financial institution. We shall not be responsible for any loss incurred as a result of our acting upon or executing any request, order or instruction we believe to be genuine. Furthermore, we may refuse to execute any telephone request or order.

### Telephone Communication:

For our mutual protection, and to enable us to provide better service to you, we may monitor and/or tape-record any of our telephone conversations.

If you provide us with your cell phone number as a contact number for your Account, you agree that we may call that number with service messages, including calls via an autodialer or prerecorded calls, notwithstanding any state or federal law or regulation that would otherwise prevent us from engaging in this activity without your consent.

### Electronic Communication:

Any communication contemplated by this Agreement may be delivered by electronic means if you have agreed to electronic notices rather than via US mail or other means to the extent permitted by law.

### Powers of Attorney:

If you wish to designate an attorney-in-fact, you must do so in a form acceptable to us. Subject to the laws of your State, we reserve the right to refuse to honor any Power of Attorney presented to us, as well as to refuse to recognize a successor attorney-in-fact at any time, whether or not the successor attorney-in-fact is specifically identified in the Power of Attorney. In addition, we reserve the right to refuse to follow the instruction of an attorney-in-fact to designate the attorney-in-fact as a joint account holder, ITF beneficiary, or POD beneficiary to the Account. You agree that we are authorized, but not required, to honor a Power of Attorney until we receive written notice (1) that you have revoked the Power of Attorney or (2) that the Power of Attorney has been revoked as a matter of state law, and that we have had a reasonable opportunity to act on that written notice.

### Adverse Claims:

Upon receipt of oral or written notice from any party of a claim regarding the Account, we may place a hold on your Account and shall be relieved of any and all liability for our failure or refusal to honor any item drawn on your Account or any other withdrawal instruction. We may file an action in interpleader with respect to any Account where we have been notified of disputed claims to that Account. If any person asserts that a dispute exists, we are not required to determine whether that dispute has merit in order to refuse to honor the item or withdrawal instruction, or to interplead any funds in the Account.

### Legal Proceedings /Other Restrictions:

We may restrict the use of your Account if the Account is involved in any legal or administrative proceeding, whether or not we're a party to the proceeding. All expenses incurred by us as a result of a proceeding affecting your Account, may be charged against your Account or billed to you separately. These fees may include, but are not limited to, court costs and attorney fees.

We may also restrict the use of your Account when we reasonably consider such action necessary to avoid a loss. This may occur if we suspect that irregular, unauthorized, or unlawful activities may be involved with your Account, whether or not we suspect that you are directly or indirectly aware of these activities. Such restrictions shall be placed pending an investigation of these activities.

### Set-Off:

You agree that we may, without prior notice or demand, apply or set off the funds in your Account at any time to pay off any debt, whether direct or indirect, you have with us or any of our affiliates and/or any fees or service charges owed to us, and you grant us a security interest in each Account to secure such debt, as it may arise. *You expressly agree that such rights extend to any Federal or state benefit payments (including without limitation Social Security benefits) electronically deposited into your Account. You understand and agree that if you do not want your benefits applied in this way, you may change your direct deposit instructions to the benefits payor at any time.* If your Account is a joint account and one or more joint owners are indebted to us in any manner, we may use the funds in the joint account to pay the debt without prior notice to you. This right of set-off does not apply if the debt is created under a consumer credit card plan or your right to withdraw funds from the Account arises only in a representative capacity. You also acknowledge and agree that any federal benefits or other payments deposited to your Account after a date of ineligibility must be returned to the Federal Government or other payor, as applicable, and we may set-off against any of your Accounts in order to recover any ineligible benefits or payments you may have received if we are obligated to return funds to the payor. If we make a set-off against your Account, you agree to release and indemnify us from all liability for our actions.

If you or any joint owner draws a check or otherwise authorizes withdrawals not presented for payment until after the drawer's death, or if any joint owner is indebted to us at the time of his or her death, we are authorized to pay such checks and withdrawals and exercise our right of set-off against the Account after such joint owner's death, notwithstanding any rights

17

that a surviving joint owner, a POD payee or a beneficiary of an ITF or "trustee for" account may have to funds in the Account.

## No Waiver:

No failure by us to exercise any right will be taken as a waiver of that right or any other right, and we may still enforce all of our rights in the future.

## Closing Your Account:

Either you or the Bank may close your Account at any time with or without cause. If you close your Account, you may be charged an Account Closing fee. We may automatically close your Account if it reaches a zero balance. Any closed account may be automatically reopened if we receive a deposit to the Account. If we close your Account, we may send you written notice that the Account is closed on the date we close your Account.  We will return the balance in your Account less any fees or service charges, claims, setoffs or other amounts you owe us, if such net amount exceeds one dollar. Please allow four weeks to receive such funds from us. After your Account is closed, we have no obligation to accept deposits or pay any outstanding checks. You agree that we shall be relieved of any and all liability for refusing to honor any check drawn on a closed Account. We have the right to advise consumer reporting agencies and other third party reporting agencies of accounts closed for misuse.

## Change in Account Agreement:

We may change the terms of this Agreement, including any fees or features of your Account, upon notice sent to you via ordinary U.S. mail at least 30 calendar days prior to the effective date of the change; provided however, for automatically renewable CDs, no such change shall be effective prior to the renewal date, and such notice may be provided with ten days written notice prior to the renewal date. You agree that such notice may be provided to any joint account owner. By maintaining your Account after the effective date of any change, you agree to be bound by the changes. No notice is required for changes in the interest rate and corresponding changes in the annual percentage yield for variable rate accounts or in fees for document printing.

## Rules Governing Your Account:

Your Account is governed by all rules and regulations of applicable federal law and the laws of your State (to the extent they are not considered to have been preempted by federal law), including those that may modify the terms of this Agreement. All deposits, items transmitted for collection, and any other transactions concerning your Account are subject to applicable clearinghouse rules and Federal Reserve rules and regulations.

Notwithstanding any other provision herein, this Agreement or any section of this Agreement may be changed or terminated without notice to the extent necessary to comply with any law or regulation of any appropriate federal or state authority.

If a conflict exists between any provision of this Agreement and any statements made by any employee of ours or our affiliates, this Agreement and the applicable sections will control.

## Liability:

You agree that we shall be relieved of any and all liability for acting upon your instructions or failing to act on your instructions when we reasonably believe that to do so would cause us to be exposed to civil or criminal liability, or conflict with customary banking practices.

 **YOU AGREE THAT WE SHALL NOT BE LIABLE FOR INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES REGARDLESS OF THE FORM OF ACTION AND EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**

**IF WE FAIL TO STOP PAYMENT ON AN ITEM, OR PAY AN ITEM BEARING AN UNAUTHORIZED SIGNATURE, FORGED DRAWER'S SIGNATURE OR FORGED ENDORSEMENT OR ALTERATION, OUR LIABILITY, IF ANY, SHALL BE LIMITED TO THE FACE AMOUNT OF THE ITEM.**

## Research and Legal Process:

If any legal process, including without limitation any subpoena, writ of garnishment, execution or any levy, is served on us relating to you or your account, we are authorized to comply with the legal process, and are not required to determine whether the court issuing the legal process had jurisdiction over you or over the account or otherwise had the authority to issue the legal process. To the extent not prohibited by applicable law, you will be charged for research, reproduction and production of documents for our compliance with legal process and any other expenses incurred by us in connection with our compliance, including but not limited to attorneys' fees.

If any action, including administrative proceedings, garnishment, tax levies, restraining orders or other action is brought against you or your account, you agree to indemnify, defend and hold us harmless from all actions, claims, liabilities, losses, costs and damages (including attorneys' fees) associated with our compliance with any legal process.

## Location of All Legal Proceedings:

If you file any lawsuit or other legal proceeding against us that is connected in any way to your Accounts or services, you must do so in an appropriate court in the state and county where you opened the account. If you relocate your Account to another

branch, you must file any lawsuit or proceeding in the state and county where that branch is located. In addition, if we file any lawsuit or legal proceeding that is connected in any way to your Accounts or services, you consent to jurisdiction and venue in an appropriate court in the location described in this paragraph. If either party chooses to have disputes determined under the section entitled Arbitration, that section rather than this section governs the process and location of the arbitration proceedings.

If you reside in a U.S. state where we have branch offices, any account you open by mail, internet, or other remote means will be assigned to a branch in the state where you reside, and for purposes of this section your account will be considered to be opened at that branch. If you do not reside in a U.S. state where we have branch offices, any account you open by mail, internet, or other remote means will be considered to be opened in Franklin County, Ohio.

## Waiver of Immunity:

To the extent that you have or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, or otherwise) with respect to itself or its property, you hereby irrevocably waive such immunity in respect of your obligations hereunder to the extent permitted by applicable law. Without limiting the generality of the foregoing, you agree that such waivers shall have the fullest extent permitted under the Foreign Sovereign Immunities Act of 1976 of the United States and are intended to be irrevocable for purpose of such act.

## Arbitration:

PLEASE READ THIS PROVISION CAREFULLY. IT PROVIDES, WITH THE SPECIFIC EXCEPTION STATED BELOW, THAT ANY DISPUTE MUST BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT. YOU WILL NOT BE ABLE TO BRING A CLASS ACTION OR OTHER REPRESENTATIVE ACTION IN COURT, NOR WILL YOU BE ABLE TO BRING ANY CLAIM IN ARBITRATION AS A CLASS ACTION OR OTHER REPRESENTATIVE ACTION. YOU WILL NOT BE ABLE TO BE PART OF ANY CLASS ACTION OR OTHER REPRESENTATIVE ACTION BROUGHT BY ANYONE ELSE, OR TO BE REPRESENTED IN A CLASS ACTION OR OTHER REPRESENTATIVE ACTION. IN THE ABSENCE OF THIS ARBITRATION AGREEMENT, YOU AND THE BANK MIGHT OTHER-WISE HAVE HAD A RIGHT OR OPPORTUNITY TO BRING CLAIMS IN A COURT, BEFORE A JUDGE OR JURY, AND/OR TO PARTICIPATE OR BE REPRESENTED IN A CASE FILED IN COURT BY OTHERS (INCLUDING CLASS ACTIONS). EXCEPT AS OTHERWISE PROVIDED BELOW, THOSE RIGHTS ARE WAIVED. OTHER RIGHTS THAT YOU WOULD HAVE IF YOU WENT TO COURT, SUCH AS THE RIGHT TO APPEAL AND TO CERTAIN TYPES OF DISCOVERY, MAY BE MORE LIMITED OR MAY ALSO BE WAIVED.

Either you or the Bank may, without the other's consent, elect mandatory, binding arbitration of any claim, dispute or controversy raised by either you or the Bank against the other, or against the employees, parents, subsidiaries, affiliates, beneficiaries, heirs, agents or assigns of the other, arising from or relating in any way to this Agreement, any prior account agreement between you and the Bank, or the advertising, the application for, or the approval of your Account (the "Claim" or "Claims"). All Claims originating from or relating to this Agreement are subject to arbitration, no matter what theory they are based on or what remedy they seek, whether legal or equitable. This includes Claims based on contract, tort (including intentional tort), fraud, agency, negligence, statutory or regulatory provisions, or any other sources of law, or any request for equitable relief.

Claims subject to arbitration include Claims that are made as counterclaims, cross claims, third party claims, interpleaders or otherwise, and any party to a proceeding in court may elect arbitration with respect to any Claims advanced in the lawsuit by any party or parties.

As an exception to this arbitration provision, you retain the right to pursue in a small claims court, any Claim that is within that court's jurisdiction and proceed on an individual basis.

If you or the Bank elects to arbitrate a Claim, the arbitration will be conducted as an individual action. Neither you nor the Bank consents or agrees to any arbitration on a class or representative basis, and the arbitrator shall have no authority to proceed with any arbitration on a class or representative basis. This arbitration provision applies to and includes any Claims made and remedies sought as part of any class action, private attorney general or other representative action, which Claims hereby are made subject to arbitration on an individual (non-class, non-representative) basis. This means that even if a class action lawsuit or other representative action, such as that in the form of a private attorney general action, is filed, any Claim between you and the Bank related to this Agreement raised in such lawsuits will be subject to an individual arbitration Claim if either you or the Bank so elects.

The party filing a Claim in arbitration must select either one of two national arbitration administrators: the National Arbitration Forum ("NAF") or the American Arbitration Association ("AAA"). The arbitration organization that is selected will apply its code or procedures in effect at the time the arbitration claim is filed, unless any portion of that code or those procedures is inconsistent with any specific terms of this arbitration

19

provision and/or this Agreement, in which case this arbitration provision and this Agreement shall prevail. The arbitration will be conducted before a single arbitrator. The arbitrator will apply applicable substantive law, including but not limited to the applicable Uniform Commercial Code, consistent with the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA") and the applicable statute of limitations or condition precedent to suit, and will honor claims of privilege recognized at law. The arbitrator will have the power to award to a party any damages or other relief provided for under applicable law, and will not have the power to award relief to, against or for the benefit of any person who is not a party to the proceeding. The arbitrator's authority is limited solely to the Claim(s) between you and the Bank alone. The arbitration may not be consolidated with any other arbitration proceeding. You and the Bank do not agree to any arbitration on any basis to which any party other than you and the Bank, the related parties enumerated above such as heirs, successors and assigns, or any other person obligated on the Account, is involved.

Any decision rendered in such arbitration proceeding will be final and binding on the parties, unless a party appeals in writing to the arbitration organization within 30 days of issuance of the award. The appeal must request a new arbitration before a panel of three neutral arbitrators designated by the same arbitration organization. The panel will reconsider all factual and legal issues anew, follow the same rules and laws that apply to a proceeding using a single arbitrator, and make decisions based on the vote of the majority. An award in arbitration will be enforceable as provided by the FAA or other applicable law by any court having jurisdiction.

We will reimburse you for the initial arbitration filing fee paid by you up to the amount of $500. If there is a hearing, we will pay any fees of the arbitrator and arbitration administrator for the first two days of that hearing. All other fees will be allocated in keeping with the rules of the arbitration administrator and applicable law. If you prevail in the arbitration of any Claim against us, we will reimburse you for any fees you paid to the arbitration organization in connection with the arbitration. All other fees, including attorneys' fees, will be allocated in keeping with the rules of the arbitration administrator. Any decision rendered in such arbitration proceedings will be final and binding on the parties, and judgment may be entered in a court

of competent jurisdiction. Rules and forms may be obtained from, and Claims may be filed with, either of the two organizations, as follows: the NAF at P.O. Box 50191, Minneapolis, Minnesota 55405, web site at *www.arb-forum.com*; or the AAA at 335 Madison Avenue, Floor 10, New York, New York 10017, web site at *www.adr.org*. Any arbitration hearing at which you

wish to appear will take place at a location within the federal judicial district that includes your address at the time the Claim is filed.

This arbitration provision is part of and constitutes a transaction involving interstate commerce, and shall be governed by the FAA.

This arbitration provision applies to all Claims relating to your Account that arose in the past, which may presently be in existence, or which may arise in the future. This arbitration provision shall survive termination of your Account as well as voluntary payment of any outstanding indebtedness in full by you, or any bankruptcy by you. If we assign your Account to any unaffiliated third party, this arbitration provision will apply to any Claim between you and that third party if you or that third party chooses arbitration, or to any Claim between you and the Bank which occurred prior to such assignment or arises from such assignment.

## Successors and Assignments:

This Agreement shall be binding on your personal representative, executors, administrators, and successors. The benefits and responsibilities of this Agreement shall also transfer to and be binding upon our successors and assigns.

You may not transfer, assign or grant a security interest in (collectively, "assign") your Account without our written consent, and no assignment will be valid, nor will we be deemed to have knowledge of or be bound by such assignment, until we have noted that fact in its records. However, by noting the assignment, we do not attest to or have any responsibility for the validity of the assignment. You understand that any assignment of your Account is subject to our right of set-off.

## Authorization to Share Information:

You authorize us to share information about you and your Account with affiliates and third parties, as permitted by applicable federal and state laws.

# Check 21 – Substitute Checks and Your Rights

## What is a substitute check?

To make check processing faster, federal law permits banks to replace original checks with "substitute checks." These checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a substitute check states: "This is a legal copy of your check. You can use it the same way you would use the original check." You may use a substitute check as proof of payment just like the original check.

Some or all of the checks that you receive back from us may be substitute checks. This notice describes rights

20

you have when you receive substitute checks from us. The rights in this notice do not apply to original checks or to electronic debits to your account. However, you have rights under other law with respect to those transactions.

## What are your rights as a CONSUMER regarding substitute checks?

In certain cases, federal law provides a special procedure that allows you to request a refund for losses you suffer if a substitute check is posted to your account (for example, if you think that we withdrew the wrong amount from your account or that we withdrew money from your account more than once for the same check). The losses you may attempt to recover under this procedure may include the amount that was withdrawn from your account and fees that were charged as a result of the withdrawal (for example, bounced check fees).

The amount of your refund under this procedure is limited to the amount of your loss or the amount of the substitute check, whichever is less. You also are entitled to interest on the amount of your refund if your account is an interest-bearing account. If your loss exceeds the amount of the substitute check, you may be able to recover additional amounts under other law.

If you use this procedure, you may receive up to $2,500 of your refund (plus interest if your account earns interest) within 10 business days after we received your claim and the remainder of your refund (plus interest if your account earns interest) not later than 45 calendar days after we received your claim.

We may reverse the refund (including any interest on the refund) if we later are able to demonstrate that the substitute check was correctly posted to your account.

## How do you make a claim for a refund?

If you believe that you have suffered a loss relating to a substitute check that you received and that was posted to your account, please contact us at:

By Phone:   English 1-800-935-9935
Spanish 1-877-312-4273
Hearing Impaired 1-800-242-7383

You must contact us within 40 calendar days of the date that we mailed (or otherwise delivered by a means to which you agreed) the substitute check in question or the account statement showing that the substitute check was posted to your account, whichever is later. We will extend this time period if you were not able to make a timely claim because of extraordinary circumstances.

**Your claim must include –**

• A description of why you have suffered a loss (for example, you think the amount withdrawn was incorrect);

• An estimate of the amount of your loss;

• An explanation of why the substitute check you received is insufficient to confirm that you suffered a loss; and

• The following information to help us identify the substitute check; the check number, the name of the person to whom you wrote the check, and the amount of the check.

# Important Endorsement Standards for Personal and Business Accounts

Your compliance with the Bank's endorsement standards is necessary to help assure that the checks you deposit will be cleared on a timely basis. The Bank's endorsement standards are:

• Customer endorsements must be placed in the 1½ inch area starting at the left side of the check;

• The remaining area of the check cannot contain any pre-printed stamped or handwritten customer information. The diagram below illustrates where the endorsements must appear to comply with these endorsement standards; and

• The check is viewed from the front as though it is transparent.

